Opinion delivered April 24, 1886.

[No. 3778.]

## T. B. BRUMLEY *v.* THE STATE.

1. MURDER—PRACTICE—EVIDENCE.—It is a general rule that, "in cases in which it is material to inquire into the demeanor, conduct, and mental feelings of an individual at a particular period, the declarations made and the expressions used at the period in question are, in their nature,

original evidence,    *    *    *    *    Verbal and written declarations are often said to be admissible as part of the *res gestœ*. As such they are most properly admissible when they accompany some act, the nature, object or motives of which are the subject of inquiry. In such cases words are receivable as original evidence, on the ground that what is said at the time affords legitimate if not the best means of ascertaining the character of such equivocal acts as admit of explanation from those indications of the mind which language affords."

2. Same.—Otherwise stated, the rule is as follows: "When it is necessary on the trial of a cause, to inquire into the nature of a particular act, or the intention of the person who did the act, proof of what the person said at the time of doing the act is admissible in evidence as part of the *res gestœ* for the purpose of showing its true character; but, to render such declarations competent, the act with which it is connected should be pertinent to the issue; for, when the act is *per se* incompetent, the union of the two will not render the declaration admissible." See the opinion *in extenso* for evidence in a murder case *held*, under the rule stated, and under the circumstances of the case, to have been erroneously admitted.

3. Same—Self Defense.—The rule is statutory, and of almost universal acceptation, that a person may act in his self defense upon reasonable appearances of danger, and that whether danger is apparent or not is always to be determined from the defendant's standpoint.

Appeal from the District Court of Hunt. Tried below before the Hon. J. A. B. Putman.

The indictment in this case charged the appellant with the murder of Isaac McAdams, in Hunt county, Texas, on the sixth day of September, 1884. His trial resulted in his conviction of murder in the second degree, his punishment being affixed at a term of twenty years in the penitentiary.

Yancey O. McAdams was the first witness for the State. He testified that he was a brother of the deceased, and that he knew the defendant. On the morning of September 6, 1884, the deceased was at the witness's house in Hunt county, Texas, and the two spoke of hauling some hay which they had cut a few days before. The deceased was then on his way to the house of Robert McAdams to borrow a wagon, to be used in transporting the hay, which work, it had been agreed between the witness and the deceased, was to be done on that day. Deceased left the witness's house for that of Robert McAdams, riding one and leading another horse. He was in his shirt sleeves. Deceased lived about half a mile west from the witness's house, and Robert McAdams lived about half a mile east from the witness's house. The defendant lived about midway between the houses

of the witness and Robert McAdams, and on the road leading between the two houses. The witness last saw the deceased alive about an hour before he saw his dead body. Witness went to the hay ground when the deceased started to Robert Mc-Adams's. Some time after the witness's arrival upon the hay ground, a man came to him and told him that the defendant had killed his brother Isaac near his, defendant's, house. Witness went immediately to the point indicated, and found his brother lying face down, dead, at the edge of the road immediately in front of defendant's gate. Nichols reached the body before the witness did, and was with the body when the witness arrived. Witness started to turn the body of his brother over, but Nichols admonished him not to touch it until the coroner arrived to hold an inquest. Witness did not then know how, or in what part of his body, his brother was shot. Witness remained at the body a short time and then went to Greenville. Deceased, when shot, was dressed in an ordinary pair of pants, shirt, hat, and brogan shoes. He had no coat on, and was totally unarmed. Defendant's house stood immediately on the north side of the road leading from the house of the deceased to that of Robert McAdams, and was between the two.

Ben Williams testified, for the State, that he was acquainted with the defendant, and knew the deceased in his life time. Witness was arrested in Dallas county, Texas, about thirty miles from Caddo Mills, by R. D. Hooten, Grade Smith, and the defendant, on a charge of killing the defendant's horse. This arrest was made on the Tuesday or Wednesday prior to the killing of Isaac McAdams. Witness was then living in Dallas county. After leaving the place where the witness was arrested, the defendant and Hooten stopped to get breakfast, and witness and Smith rode on. Hooten and defendant overtook witness and Smith after they had ridden some five or six miles, and passed through a small town. Some words passed between Hooten and Smith, which culminated in Hooten proposing that Smith should take the witness and travel on in advance, and declaring that he, Hooten, would have nothing more to do with the custody of witness. Smith refused to ride on in advance, with witness. Hooten and witness then rode on together, and when they got some distance in advance of Smith and the defendant, Hooten told witness that they had no papers for witness's arrest, and that if witness wanted to make his escape, now was his time to "run for it." Witness replied that he did not want to get

away.   Hooten presently fell back and joined Smith, and defendant joined and rode on with the witness.   Defendant remarked to witness that he had nothing against him; that he believed witness was induced to kill his horse by the McAdamses, and that he was going to make them acknowledge it on the day of the trial at Caddo Mills.   The several parties went on to Caddo Mills, where the witness entered into bond.   He then went to the house of Isaac McAdams, and s†ayed over night.   Witness told Isaac McAdams what defendant said to him.   Witness stayed all night at the house of Isaac McAdams, on the night that defendant's horse was killed, which was Tuesday night. He did not go to church on that night.   He went to Dallas county on the next day, and remained there until he was arrested.

H. J. Pile testified, for the State, that he now lived at Bonham, in Fannin county, Texas, but in August and September, 1884, he lived in Hunt county, Texas, and was then justice of the peace of the third precinct of that county.   Witness presided at the trial of Ben Williams, for killing the defendant's horse.   That trial occurred on the Thursday preceding the killing of Isaac McAdams, which occurred on Saturday.   Ben Williams was tried at Caddo Mills.   Several members of the McAdams family, and their relatives, attended the trial.   Isaac, Y. O., Robert, and Jim McAdams, and their relatives, Ben Williams and Bethune, were present.   The defendant was present, as a witness against Williams.   After Williams's trial, and while witness was still in his office, he heard a row in front of Kennedy's store.   He heard Isaac and Yancey McAdams, and perhaps others, cursing and swearing.   Isaac McAdams had a knife in his hand, and Yancey had a piece of an iron coupling pin.   Dick Hooten was standing in front of Kennedy's store, with his pistol in his hand, talking very loud.   Witness did not see the defendant at that time, and presumed that he was in Kennedy's store.   Hooten called out: "Peace!"   Isaac ·McAdams replied: "D—n the peace !   We want to fight."   Witness ran up to, and placed his hand on old Jim McAdams, and told him that he summoned him to aid in keeping the peace.   Old man Jim McAdams said that if Dick Hooten would put up his pistol he would make the boys behave themselves.   He then called to the boys (the McAdamses) to cease, and the row was quieted.   On that evening Isaac McAdams told the witness that he did not want the witness to issue any more process for him, or any of his relatives, and that if witness did, he would not submit.

On Thursday a complaint was filed before witness charging Yancey and Isaac McAdams with a disturbance of the peace. On Friday they appeared, pleaded guilty, and paid the fines imposed upon them. On Thursday or Friday evening the defendant, in company with Grade Smith and Dick Hooten, came to witness and wanted to secure a warrant for the arrest of Yancey and Isaac McAdams. It was the impression of the witness that defendant wanted them placed under a peace bond. He said that they had threatened him, and that he was afraid of them. Witness told the defendant that he did not think any good could be accomplished by such proceeding, and that it might end only in aggravating the already bitter feeling. On the following Saturday witness held the inquest over the dead body of Isaac McAdams. He found the body lying face down, immediately on the outside of the road, thirty or forty feet from the defendant's house. The fatal ball entered the face of the deceased just below the nostril. Deceased's left hand lay on or under his breast. His right hand was partially extended. No physician was at the body while the witness was there.

Y. O. McAdams, recalled for the State, testified that on Wednesday, after Williams was brought back to Caddo Mills by defendant, Hooten, and Smith, witness heard Williams tell Isaac McAdams what defendant said to him on that day,—word for word as testified by the witness Williams. Witness was present at Williams's trial on Thursday before the killing. He saw the defendant there, but not after the trial. Witness heard a difficulty there on that day. He first heard his uncle, Josiah McAdams, and Jeff Buce, the defendant's step son, in a dispute about something that had been testified on the trial. Josiah McAdams told Buce that he had sworn to a lie. Witness stepped between the disputants, and told Buce not to be quarreling with an old man, but to confront a young one like himself, witness; that he, witness, could whip any two of his, Buce's, crowd. Some one then pushed Buce into Kennedy's store, and Hooten, who was the constable of that precinct, stepped to the gallery, waving his pistol. Isaac McAdams, the deceased, said to Hooten: "G–d d——n you, if you will step off of that gallery, I am change for you. You keep out of this affair, G–d d——n you; it is no affair of yours." Five or six of the McAdamses, and Williams and Bethune were there. Witness held a piece of iron in his hand during the row. He heard no one on the ground say: "D——n the peace! Peace is not what we want; we want war!"

Newton Watson testified, for the State, that he lived in Kaufman county, Texas, but was in Hunt county at the time Isaac McAdams was killed. Witness was traveling the road on which the defendant's house was located, on the morning of the homicide. He was going west. As the witness approached the defendant's house, he saw the defendant sitting on his fence. At the same time he observed the approach of a man on horseback, leading another horse. That man was Isaac McAdams. When McAdams reached a point about opposite the defendant, the latter got down from the fence and stepped into the road. McAdams stopped, the defendant then standing immediately in front of McAdams's horse. Witness did not hear the words which first passed between the deceased and the defendant. The first words he understood, as he approached the parties, were spoken by the defendant. He said: "I understand that you say I killed my own horse." Deceased replied: "If I said it once, I say it again." Defendant replied: "You are a G—d d—d horse thief." Deceased asked: "Can you prove it?" Defendant repeated: "You are a d—d horse thief;" and deceased asked again if he could prove it. By this time witness had reached a point between the defendant's house and the two men. Just as witness reached that point, defendant thrust his hand into his pocket, and witness heard his pistol click. McAdams attempted to throw himself from his horse on the right side. Witness saw defendant level his pistol at the deceased as the latter was dismounting, and, not caring to witness a tragedy, put spurs to his horse and fled, going west as rapidly as his horse could travel. Witness was unable to say whether either the horse ridden or the horse led by the deceased, wore either saddle or harness. Grade Smith was standing at the defendant's fence when witness passed. The deceased and the defendant, when last seen by the witness, were standing about fifty feet from the defendant's house, and about thirty feet from the yard fence.

J. W. Brem testified, for the State, that he was related to the defendant's wife. He lived in Franklin county, Texas, but was in Hunt county on the day of the homicide. He passed the night preceding the killing at the defendant's house. Grade Smith also spent that night at the defendant's house. Defendant and Grade Smith went out of the house on the next morning, but witness did not see what they did outside. While the witness was sitting in the house, talking to the defendant's wife, his attention was attracted by loud talking in front of the yard.

Looking out, he saw Isaac McAdams in the road, on horseback, and the defendant standing in front of the horse's head. Witness did not hear the first words spoken by either of the parties. The first words he heard and distinctly understood were spoken by deceased. He said: "You are a d—d horse thief, and I believe you killed your own horse." Defendant asked: "Can you prove it?" Deceased replied: "I don't know that I can, but you are a G—d d—d thief." About this time defendant thrust his hand into his pocket, and deceased began to throw himself from his horse, cn the right hand side, which was on the side opposite the defendant. Witness thought that, at that juncture, the defendant snapped his pistol at deceased, as the latter got off his horse. Deceased got off his horse by sliding off at his rear. Defendant was then standing at the head of the horse, with his pistol in his hands. Both parties made several dodges about the horse, until finally they came face to face, when the defendant fired, and the deceased fell, face down, his head striking the ground almost at the defendant's feet. He was shot in the face, just beneath the nose, and died almost instantly. Grade Smith was then somewhere in the defendant's yard, but the witness did not know where. Grade Smith and defendant rode off together just after the shooting. Defendant's wife was at home, but could see nothing of the difficulty from where she was. Witness did not know which of the two, deceased or defendant, began the conversation. He did not hear Isaac McAdams's name mentioned by defendant or Smith at any time before the shooting. He did not see a pistol in the possession of either Smith or defendant before the shooting. McAdams was moving towards the defendant when he was shot. Defendant was then moving around the horse's head in the same direction. Witness did not know that deceased started to dismount before defendant drew his pistol. He did know that defendant was drawing his pistol as McAdams was getting off his horse. State closed.

R. D. Hooten was the first witness for the defense. He testified that he was constable of the Caddo Mills precinct in Hunt county, Texas, from September, 1878, to September, 1884. A warrant for the arrest of one Williams and one Bethune, for killing the defendant's horse, was delivered to witness for execution in September, 1884. Witness did not know the residence of Williams, and summoned the defendant and Grade Smith to go with him and make the arrest. Williams was arrested in Dallas county, and taken before justice of the peace Pile, on Thurs-

day before the killing. He gave an appearance bond, and was released. Williams did not ride alone with the defendant at any time between the place of his arrest and the office of Esquire Pile. Either Smith or the witness had charge and custody of Williams throughout the entire ride. Witness was at Esquire Pile's court at Caddo Mills on the Thursday previous to the killing of Isaac McAdams. A difficulty or "row" of considerable proportions occurred there on that day. Old Joe McAdams, old Jim McAdams, Yancey and Isaac McAdams, Williams and Bethune, nephews of the McAdamses, and perhaps others, were there. Old Joe McAdams accused Jeff Buce of swearing to a lie on the trial of Williams. The other parties named took the side of old Joe McAdams, and the crowd got to cursing the defendant. Witness made defendant go into Kennedy's store to avoid the McAdamses, Williams, and Bethune. Witness stood on the gallery of Kennedy's store and commanded the peace. The McAdams crowd replied that peace was not what they wanted; that they wanted war or blood. The McAdams crowd were bunched immediately in front of the store; and defendant was just inside of the store. The McAdamses were cursing very loud. Isaac McAdams said that he was going to cut the defendant's heart out, chew it up, and spit it out. He exclaimed that the defendant had "tried to ruin a boy's character by charging him with killing his horse;" that he, defendant, was "a horse thief and murderer," and that he (deceased) "would cut the d——d son-of-a-b——h's heart out, chew it up, and spit it out as quick as he would take a drink of water." Witness was then using the utmost endeavor to preserve the peace. Esquire Pile commanded the peace, and told old Jim McAdams that he must restore quiet, and the "row" was presently quelled. After the row was over, defendant asked Esquire Pile to put the McAdamses under a peace bond. Esquire Pile advised against the step as likely to aggravate the McAdamses.

Cross-examined, the witness admitted that he told defendant and Grade Smith to bring their pistols with them to Caddo Mills, on Thursday, the day of the Williams trial. He did not tell them what he wanted with them. Witness had heard some of the threats made by the McAdams party, and expected trouble. Defendant did not have his pistol on the day of Williams's trial. His pistol was in the witness's possession all day. Witness did not draw his pistol while on Kennedy's porch commanding the peace. When the McAdams party said that peace was not what

they wanted, Isaac McAdams, holding a piece of iron or a knife in his hand, said to witness: "G–d d——d you, I am the change for you." It was then that witness drew his pistol. Old Jim McAdams easily quieted the row when ordered to do so by Esquire Pile. Defendant was inside of Kennedy's store throughout the row, and did not utter a word from its beginning to its end.

Re-examined, the witness testified that Isaac McAdams was a large, stout man, about thirty years old, and would weigh from one hundred and sixty to one hundred and seventy-five pounds. The defendant was a very small, feeble man, not exceeding one hundred and five pounds in weight, and was crippled in one hand and nearly blind. He could not see well enough to recognize a person in the road without a good, close look, unless by voice. Deceased was a firm, determined man, and had the reputation of being a very violent and dangerous man. Deceased told Esquire Pile never to issue another writ,—not even a subpœna,—for any of his connection; that no body should serve any such papers.

Andrew Morrison testified, for the defense, that on the day prior to the trial of Williams, at Caddo Mills, old man Joe McAdams came to witness's house and asked witness if he had loaned Dick Hooten a horse to ride to Dallas county for the purpose of arresting Williams. Witness replied that he had loaned Hooten a horse for defendant to ride, but he did not know where nor for what purpose defendant was going. Old Joe McAdams then asked if witness's horse had been returned, and witness replied that it had not. Old Joe then said: "Brumley has had an orphan boy arrested, and some lies will be sworn to to-morrow. If you want your horse, you had better get him, or he might get killed. A crowd is going to come out of that timber to-morrow and go to Caddo Mills and raise h—ll." About that time witness saw Hooten and defendant at a distance, and told old Joe that he would get his horse. Witness went to Caddo Mills on the next day to get his horse. On his arrival he found the defendant inside of Kennedy's store, and several of the McAdams boys, with Williams and Bethune, were in front of it, cursing very loud. He heard Hooten command the peace, and heard Isaac McAdams curse Hooten, say that he was change for Hooten, and that he did not want peace, but war and blood. Isaac McAdams said, also, that defendant had tried to ruin the character of his nephew, as good a man as ever lived; had sworn

lies on the trial; that he, defendant, killed the horse himself, and that he, Isaac McAdams, "would cut his heart out, chew it up, and spit it out as quick as he would take a drink of water." Old Jim McAdams finally brought about quiet.

Grade Smith testified, for the defense, that he was at Caddo Mills on the day of Williams's trial and its resultant row. He and defendant were in Kennedy's store throughout the whole of the disturbance. Hooten was on the store gallery. Five or six of the McAdamses, Williams and Bethune were in front of the store, cursing boisterously and trying to get at the defendant. Hooten commanded the peace. Isaac McAdams retorted: "G–d d——n the peace; we don't want any peace!" Esquire Pile demanded the peace, and Isaac McAdams told him never to issue process against his connections again,—not even a subpœna,—and that if he did it should not be served by any body. He then held a knife or piece of iron in his hand, and was cursing violently. All of the McAdams party were cursing the defendant. Hooten had previously told the witness that he had understood it to be the purpose of the McAdams crowd to precipitate a row at the Williams trial, and "clean Brumley up." He, Hooten, told witness to be at Caddo Mills at the trial. Witness heard Isaac McAdams, during the progress of the disturbance, say that the "defendant, G–d d——n him, was trying to ruin the character of Williams;" that he believed he, defendant, "killed his horse himself;" that he was "a thief and a murderer," and that he, deceased, "could cut his heart out, chew it up, and spit it out." Witness never in his life heard as much cursing and swearing at any one time and place. On the next day the witness went with the defendant to Caddo Mills, to see Esquire Pile, and have Isaac McAdams placed under a peace bond. Not finding Mr. Pile at home, they returned, the defendant saying that he would go to Greenville the next day and see the county judge about placing deceased under a peace bond. En route to defendant's house on that (Friday) evening, the witness and defendant met the deceased and Bethune. Defendant and witness both greeted them with, "Good evening, gentlemen." Deceased replied, addressing the witness only: "Good evening, Grade." Witness could not say that defendant did or did not recognize deceased and Bethune when he spoke to them.

The witness spent that (Friday) night with the defendant. Some time after they had gone to bed, some one knocked at the

door.   Defendant frightened, raised up in bed with his pistol, and said: "They are coming after me now."   Witness recognized a voice outside and told Brumley that it was a friend.   It proved to be a neighbor with Mr. Brem.   When the witness went out next morning to get his horse for the purpose of going home, he found the defendant sitting on his fence in front of his house. Defendant remarked: "You are not going off just as rain is coming up."   Witness looked and saw that it was showering in the direction of his house.   He then went back into the house, remained but a few moments, and went out to the fence, and took a position about fifteen feet from where the defendant was sitting.   About this time witness observed the approach of Isaac McAdams on horseback, and told the defendant.   Isaac McAdams rode up and stopped within a few feet of the defendant.   Defendant said:  "Good morning, Mr. McAdams."   Deceased made a suppressed reply that witness did not understand.   Defendant then said:  "I understand you said that I killed my own horse." Deceased replied:   "Yes, I did, and you are a G—d d—d thief!" Defendant replied:  "I want you to take that back; can you prove it?"   Deceased said:  "You are a G—d d—d thief and murderer!   You killed your own horse, and I am none to good to kill you."   Thereupon the deceased jumped from his horse, and the defendant jumped from the fence, drew his pistol and snapped it at deceased over the horse's wethers.   Deceased then ran around his horse toward defendant.   The defendant fired as he approached, and the deceased fell, his head striking the ground just at the defendant's feet.   Not more than five or six feet intervened between the parties when the fatal shot was fired.   Newt Watson rode up just as the conversation between defendant and deceased began.   He made some remark about not wanting to see the trouble, and ran his horse off at full speed.   He ran off as soon as the parties spoke.   Witness and defendant went to Greenville after the shooting, and the defendant surrendered to the sheriff.   Deceased was a stout, able bodied man of about one hundred and sixty pounds weight.   Defendant was a feeble man, weighing about one hundred pounds.   He was so nearly blind that he could not identify persons at a short distance except by voice, and one of his hands was crippled.

Cross-examined, the witness testified that he moved to Caddo Mills during the war.   The defendant could not see a cow as far as the witness could distingnish the brand on one.   The witness was not an officer at the time of the McAdams-Williams-Brum-

ley row.  He was under commission as a special deputy to arrest some cow thieves, and was then on the hunt for one, having previously effected the arrest of one.  The cursing at Caddo Mills was done by the McAdams crowd.  Hooten and Pile tried hard to suppress the disturbance.  Witness did not think that old Jim McAdams was any more anxious for peace, at first, than the others of the McAdams crowd, but when Pile admonished him that, being able to, it was his duty to restore peace, he said that he wanted peace, and brought it about.  Some complaints were filed against the McAdams boys and Williams, on Friday evening, and the witness had been informed that they appeared and pleaded guilty.  Defendant stayed at witness's house on the night of Thursday, the day of the Williams trial, whence, on the next day, witness went with him to Caddo Mills, to see about putting deceased under a peace bond.  Witness and defendant ate dinner on that day at the house of P. Boyles.  Thence they went to the house of Joe Smith, witness's brother; thence they went to Esquire Pile's house, and thence to the defendant's house.  Witness saw nothing of the defendant's pistol on the morning of the homicide, until he pulled and snapped it at the deceased.

Re-examined, the witness said that he was deputized by 'Squire Pile to arrest Williams and Bethune.  The main road past Brumley's house did not run along side the fence, but at some distance from the fence.  Deceased left the main road, and rode up a blind path to where defendant was sitting on the fence.

Re-cross-examined, the witness testified as follows: " I testified on the examining trial of this cause.  The transaction was fresher in my memory then than now.  Since examining my testimony, I say that Brumley said to McAdams, after McAdams said Brumley was a thief, etc., just before the killing: ' That is mighty hard to take; can you prove it?' and McAdams replied: ' I don't have to; you are a G—d d—d thief and murderer, and killed your own horse, and I am none too good to kill you,' and jumped off his horse."

J. K. Yearby testified, for the defense, that he was at Caddo Mills on Thursday, and witnessed the disturbance which succeeded the Williams trial.  Witness would not undertake to repeat all that was said by the McAdamses and others, but detailed the transactions substantially as did the other witnesses for the defense.  Esquire Pile summoned witness to aid in restor-

ing the peace. Witness approached Isaac McAdams, and said: "Old fellow, this won't do. We all have families, and must not get into trouble it will be hard to get out of." Deceased replied: "I have had to put up with a great deal. D—n Tom Brumley! I can cut his heart out, chew it up and spit it out, with as good grace as I can take a drink of water, and if he fools with me much more I will do it." After the disturbance was quieted, the witness told the defendant what the deceased said.

Cross-examined, the witness testified that Hooten drew his pistol when he commanded the peace. Deceased then told Hooten that if he wanted anything he, deceased, was change for him. Old Joe McAdams started the row by telling Jeff Buce that he swore to a d—d lie. Yancey and Isaac McAdams, Williams and Bethune, were the principal parties who did the cursing. Nobody was cursing the McAdams party. Hooten was not engaged in the row.

Andy Sherrill testified, for the defense, that he witnessed the disturbance at Caddo Mills, after Williams's trial, on Thursday. The McAdams party did a great deal of cursing. Witness caught and threw Jeff Buce into Kennedy's store, to prevent what he thought would prove a serious collision. Isaac McAdams had a knife in his hand.

Robert Henson, J. K. Yearby, J. B. Smith, and James H. Jones testified, for the defense, that the reputation of the deceased was that of a violent and dangerous man. Jones, on cross-examination, said that he spoke partly from personal knowledge of the deceased's violent character, in as much as, on one occasion, the deceased slipped up behind witness and knocked him over the head with a club.

Tom Edgar, William Crawford, and Billy Buce testified, for the defense, that they saw Ben Williams at church at the Massey school house on the night that the defendant's horse was killed. The defense closed.

E. P. Kennedy testified, for the State, in rebuttal, that he knew deceased well. The deceased was not considered a violent and dangerous man, but was regarded as a determined, high spirited man; one who, when he said a thing, "meant business."

Cross-examined, the witness said that the deceased was a man reasonably calculated to execute a threat. If deceased were to threaten to cut a man's heart out, chew it up, and spit it out, and then, in two days, go to the house of the man whom he had threatened, witness would say from his reputation, that he was

calculated to execute his threat.    Hooten tried to keep the peace at Caddo Mills on Thursday.    Defendant was in witness's store. Deceased had a knife in his hand and was cursing considerably.

Robert McAdams, the deceased's cousin, testified, for the State, in rebuttal, that the road between his and deceased's place originally ran a short distance from the defendant's fence, but, just before the killing, a pair of bars were put in the pasture fence which changed the road to run directly by defendant's fence.    Witness was present at the row in Caddo Mills on Thursday.    The disturbance began by old Joe McAdams calling Jeff Buce a liar.    Yancey and Isaac McAdams and others took old Joe McAdams's part.    Witness tried to preserve the peace.

James E. McAdams testified, for the State, in rebuttal, that he witnessed the row at Caddo Mills.    Witness's brother Joe, an old man, told Jeff Buce, a young man, that he swore to a lie on the trial of Williams.    Yancey McAdams took up for old Joe. Hooten took hold of Yancey, and then deceased took it up, and Hooten went into Kennedy's store.    He soon returned with his pistol in his hand, his thumb on the hammer and his finger on the trigger.    Williams and Bethune then "sorter" took it up for Yancey and Isaac.    Esquire Pile then told witness that he wanted peace.    Witness spoke to the boys and said he wanted peace.    The row then subsided, and witness and the McAdams party went home.    The witness, recently before the trouble, had joined his pasture fence in the defendant's front field fence, enclosing a pasture in front of defendant.    A pair of bars which he put in the pasture changed the road to run through the pasture just in front of defendant's house.    It had previously passed the defendant's house at a short distance from it.    Witness saw one of the deceased's horses after the killing.    He did not remember whether that horse had on harness or not, but did not think it did.    Defendant could not see a brand on a cow as far as witness could, but could see it at a distance of twenty or thirty steps.    Of all witness's neighbors, the defendant was the best judge of fat cattle.

Cross-examined, witness stated that he heard Hooten command the peace during the row, and heard deceased tell Hooten that he was change for him.

Neal Richey testified, for the State, in rebuttal, that deceased's reputation as a quiet peaceable man was good.    He was generally considered quiet and inoffensive, and not violent and dangerous.    Cross-examined, witness stated that he had only heard

Joe Cravens say that deceased was a quiet and inoffensive man. Witness was present at the Caddo Mills row. He heard one of the McAdams party say that defendant could be kept in Kennedy's store for that evening, but could not be kept in there always. All of the cursing during that row was done by the McAdams party.

Collier, Williams, and Kennedy, testifying for the defense in rebuttal, stated that they had long known the defendant, and that his eyesight had always, since they had known him, been very bad. He was almost blind.

The motion for new trial raised the question discussed in the opinion.

*Terhune & Yoakum,* filed an able brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

White, Presiding Judge. Preliminary to a discussion of the main question which we propose to present, we deem it essential to give a brief summary of the salient features of the evidence gleaned from the statement of facts in the record.

On Saturday, September 26, 1884, appellant Brumley shot and killed one Isaac McAdams, in the road immediately in front of his, Brumley's, residence. A few days before the homicide some one had shot and killed a horse belonging to appellant, and one Williams, who was a nephew of the deceased, had been arrested under a complaint charging him with this offense. Williams's case was tried before a justice of the peace, at Caddo Mills, on Thursday, two days before the homicide.

The McAdams family were very much incensed at the arrest of Williams, their relative, and one of the older members of the family had declared that, on the day of the court, a crowd would go to Caddo Mills "and raise hell." After the trial of Williams, seven members of the McAdams family commenced the difficulty with one Buce, a step-son of the appellant, charging him with having sworn a lie on the trial of Williams. Then the entire party began a series of abuse of the officers of court, and of Brumley, this appellant. They were very boisterous, threatening, and profane. Brumley at the time was in a store house, but could hear what was transpiring. A constable commanded the peace and endeavored to quell the disturbance, and was threat-

ened with personal violence by Isaac McAdams, the deceased. Finally the magistrate restored quiet. Isaac McAdams, the deceased, declared that peace was not what he wanted; that he wanted war or blood; and he notified the justice that he must not issue any more writs, not even a subpoena, against any of his kith or kin. He threatened Brumley's life in Brumley's hearing, saying that he would cut his heart out, chew it up, and spit it out with as much pleasure as he could take a drink of water.

After quiet was restored, and the McAdams party had left, Brumley went to the justice of the peace, and proffered to make an affidavit against Isaac McAdams, so as to have him put under a bond to keep the peace; but the justice, fearing more trouble, dissuaded him from it. It is shown by the evidence that McAdams, the deceased, was a violent and dangerous man, and one likely to execute any threats made by him; a muscular man, weighing from one hundred and sixty to one hundred and seventy pounds. Brumley was a very small, weak man, from one hundred to one hundred and ten pounds weight, crippled in one of his hands, and nearly blind.

On the morning of the homicide Brumley, the defendant, was sitting on his yard fence, a few feet in front of the door of his house. Two men, Grade Smith and John Brem, were at his house, Smith in the yard near him, and Brem in the door. A man was seen riding up through the pasture. Smith told Brumley the man was Isaac McAdams. Up to this point there is no conflict in the evidence. We will let each man tell what he saw:

Newton Watson, a transient man, said Brumley got off the fence before the deceased got up to him, and some words he did not hear were spoken, when Brumley said: "I understand you say I killed my own horse?" To which deceased replied: "If I said it once, I say it again," when Brumley replied: "You are a horse thief," and witness ran off.

John Brem, a witness for the State, said the first words he heard was McAdams's declaration to Brumley: "You are a damned horse thief, and I believe you killed your own horse," to which Brumley replied: "Can you prove it?" when deceased said: "I don't know as I can, but you are a God damned thief," and started to throw himself off his horse, and appellant at the same time drew his pistol and snapped it, and after both dodged, as McAdams approached Brumley, he fired the fatal shot while

deceased was so close to him that his head fell at appellant's feet.

Smith alone saw the whole of the difficulty. He tells us that as McAdams rode up, Brumley said: "Good morning," to which an inaudible reply was made, when appellant said: "I understand you said I killed my own horse," to which deceased replied: "Yes, I did, and you are a God damned thief." Brumley replied: "I want you to take that back. Can you prove it?" And deceased said: "You are a God damned thief and a murderer, * * * and I am none too good to kill you," when appellant drew his pistol just as deceased was getting off his horse on the opposite side of appellant, and appellant snapped but the pistol failed to fire, and as deceased came around the horse towards Brumley, he fired, when deceased was so close that his head fell at appellant's feet. These are the material facts as they were made to appear at the trial.

Amongst the errors complained of, two, as shown by bills of exception, relate to the admission of evidence over the objection of defendant, and are in regard to the same subject matter. This evidence was offered by the State, manifestly with a view of showing that the deceased, Isaac McAdams, in passing by defendant's house on the morning of the homicide did not do so for the purpose of encountering defendant, or of provoking a difficulty with him.

In substance, the testimony objected to, and the objections to the same, are sufficiently stated in appellant's brief, as follows:

"Yancey McAdams testified that, on the morning of the killing, the deceased was at his (witness's) house, and they had some conversation about hauling hay they had previously cut, and they needed another wagon, and deceased was on his way to borrow a wagon from Robert McAdams. This was objected to. 1. Because it was immaterial. 2. Defendant had no notice of the purpose of deceased in coming to or by his house. 3. The evidence was calculated to militate against the accused and impress upon the jury that deceased was there for a lawful purpose, and not to execute the threats previously made. 4. It not being shown that Brumley knew the motive of deceased in riding towards him so soon after the threats were made, Brumley could act on reasonable appearances of danger; whereas, the evidence tended to show no danger existed, and in the minds of the jury destroy Brumley's legal right of self defense. 5. The evidence was hearsay in its character. James McAdams, a

State's witness, was asked what deceased went to Brumley's for, which was objected to on the same ground. He answered, 'to borrow a wagon from Robert McAdams.' As already stated, the proof showed that Isaac McAdams had threatened the life of Brumley; that he was a violent and dangerous man, and reasonably calculated to execute a threat, and that he went into the pasture and rode up directly in front of appellant's house, where the tragedy took place."

Was this evidence admissible? It is a general rule that, "in cases where it is material to inquire into the demeanor, conduct, and mental feelings of an individual, at a particular period, the declarations made and the expressions used at the period in question are in their nature original evidence * * * * Verbal and written declarations are often said to be admissible as a part of the *res gestœ*. As such they are most properly admissible when they accompany some act, the nature, object, or motives of which are the subject of inquiry. In such cases, words are receivable as original evidence, on the ground that what is said at the time affords legitimate, if not the best means of ascertaining the character of such equivocal acts as admit of explanation from those indications of the mind which language affords." (1 Phil. on Ev., Cowan & Hill's Notes, 3 ed., 1859, pp. 181–185.)

In a case presenting an analogous question to the one we are considering (The People v. Williams, 3 Parker's Crim. Rep., 84), the Court of Appeals of New York held as follows: "When it is necessary, on the trial of a cause, to inquire into the nature of a particular act, or the intentions of the person who did the act, proof of what the person said at the time of doing it, is admissible in evidence as part of the *res gestœ*, for the purpose of showing its true character; but, to render such declarations competent, the act with which it is connected should be pertinent to the issue; for when the act is in its own nature irrelevant, and when the declaration is, *per se*, incompetent, the union of the two will not render the declaration admissible." (Citing Wright v. Doe, 7 Adolph & Ellis, 289.)

Where, on the trial of A. W. for the murder of his wife by poison, it appears that he lived apart from his wife and in the same town, and that his wife left her residence on Saturday evening before her death, and returned home at five o'clock the next morning, sick, and continued ill till she died, her symptoms being the same as in cases of poisoning: *Held*, "That it was

not competent to prove what the deceased said when she left home on Saturday evening as to where she was going; and where such evidence was admitted, and it was proved that she said she was going with clothing for her husband, and the prisoner was convicted, it was *held* erroneous, and the judgment was reversed."

In the early case of The State v. Zellers (2 Halst., N. J., Rep.), where the State offered to prove a conversation between the deceased and a witness, in which the deceased told the witness what his intentions were in going to the place where the homicide was committed, on objection by the defendant, the court held that the conversation could not be proved; that the question to be determined was, what excited the prisoner to the commission of the act? Everything that could operate upon his mind may be proved, but you can not give in evidence the conversation or acts of the deceased which never came to the knowledge of Zellers, for they could have no influence upon his mind, and could neither extenuate nor justify the crime.

It is a rule, not only statutory, but of almost universal acceptation, that a party may act upon reasonable appearances of danger, and that whether danger is apparent, or not, is always to be determined from the defendant's standpoint. (Penal Code, Arts. 570, 574; Whart. on Hom., 2 ed., sec. 4931; Whart. Crim. L., sec. 488; The State v. Cain, 20 W. Va., 679; Haney v. Conner, Ky., 5 Crim. L. Mag., 47; Jordan v. The State, 11 Texas Ct. App., 435; King v. The State, 13 Texas Ct. App., 277; Gilly v. The State 15 Texas, Ct. App., 287; Jones v. The State, 17 Texas Ct. App., 603.)

Now, in this case it was immaterial, so far as defendant's rights were concerned, what were the motives of the deceased McAdams in coming to the house of the defendant on the fatal morning of the homicide; that is, it is clearly immaterial whether his mission was a peaceable one, to-wit: going to his brother's for the purpose of getting a wagon. Such motives and intentions could not possibly have affected defendant's conduct, because the evidence shows that they had never been communicated to him, and that he was wholly ignorant of them. He should not be held in any way bound by such undisclosed motives and intentions, and, so far as he was concerned, they could not throw any light upon the immediate transaction, to-wit: the homicide. In our opinion the evidence was inadmissible.

Other errors are complained of, but they may not arise upon another trial, and we will not discuss them.

For the error in admitting the testimony above discussed, the judgment is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*