Leslie Douglas ASHLEY and Carolyn Lima, Appellants,

v.

The STATE of Texas, Appellee.

No. 34351.

Court of Criminal Appeals of Texas.

June 20, 1962.

Rehearing Denied Oct. 31, 1962.

Second Rehearing Denied Jan. 2, 1963.

Jack W. Knight, Houston, Lloyd M. Lunsford, South Houston, of counsel, on appeal, Clyde W. Woody, Houston, on rehearing only, for appellants.

Frank Briscoe, Dist. Atty., Samuel H. Robertson, Jr., and Neil McKay, Assts. Dist. Atty., Houston, and Leon B. Douglas, State's Atty., Austin, for the State.

BELCHER, Commissioner.

Leslie Douglas Ashley and Carolyn Lima were jointly tried and convicted for the offense of murder with malice; the punishment assessed by the jury for each appellant, death.

The state's testimony shows that when officers of the City of Houston arrived at a vacant lot to extinguish a fire on the night of February 6, 1961, they discovered a burning, almost nude male body, later identified as that of the deceased. An autopsy revealed that gasoline had been poured on the body and ignited after the deceased had been killed as a result of being shot six times with a .22 caliber pistol.

Further testimony of the state revealed that the appellants were seen parking their old Packard auto and entering the deceased's office on one side of a duplex about 5 P.M. on February 6, the day of the shooting. About 6:30 P.M., the occupant of the other side of the duplex, an employee of deceased, heard some noise and scuffling in the deceased's office which sounded like a fight, and also an unusual noise like a shot. However, she did not become alarmed until the next morning when she arrived for work at the deceased's office and found blood at the entrance and on the floor.

An investigation of the premises by the police revealed blood both in and outside of the office; tire tracks across the side-

walk leading to the door of the office; that the deceased's portable television and Lincoln automobile were unexplainably missing. Further police investigation led to the recovery of various articles of the deceased's clothing which had been discarded in scattered locations in the city, and the appellant's old Packard was found parked without license tags at the home of Ashley's parents.

The testimony of other witnesses established that the appellants had purchased a pistol two days prior to the shooting; that they had been seen firing it into a ditch; and that these slugs were recovered and established to have been fired from the same weapon that killed the deceased. It was further shown that at about 7:30 P.M., February 6, Lima had purchased gasoline in a five gallon can, which she did not return; that this was the same can which was found near the burning body; and that about 10:30 P.M. of the same night the appellants had filled the deceased's Lincoln with gasoline, and put the Packard license plates on it.

The state then introduced testimony tracing the flight of the appellants from New Orleans, where they spent one night, to Maryland and finally to New York City where Lima and Ashley, who was dressed as a woman, were apprehended on February 26, 1961, by Federal Agents. The deceased's Lincoln, to which Lima had the keys, was recovered and after obtaining the appellants' consent, a search of their apartment revealed the missing television set, a box of .22 caliber cartridges, and the deceased's wrist watch.

Appellant Lima, an admitted prostitute, and Appellant Ashley, an admitted homosexual, both testified and in open court admitted killing the deceased but contended that they did so in self defense and in defense of each other.

The appellants testified that they were living together in December of 1960 when Lima met the deceased and began having paid sexual relations with him about once a week. Ashley first met the deceased while disguised as a woman, but later was introduced as Lima's brother. The deceased subsequently suggested that Ashley be a part of a perverted, three-way act of sexual deviation, and on February 6, the appellants went to deceased's office to engage in these acts with him. While discussing these sordid matters, deceased lightly stuck both appellants with his "bayonet", and when deceased proposed that he and Ashley engage in acts of sodomy he became very angry and cursed when Ashley refused. The deceased and Lima then partially disrobed and had been committing sodomy on each other when the deceased started "getting rough" and tearing at her private parts. When Lima began crying out Ashley intervened and deceased started hitting and choking him. During their struggle Ashley got the pistol out of Lima's purse and fired one shot before dropping it. Deceased grabbed the "bayonet" and started swinging it at the appellants, but Lima managed to grab the pistol and fire the remaining five shots which felled the deceased.

After determining the deceased was dead, they became panicky but did manage to wipe the blood and fingerprints off of the "bayonet". Then, when their Packard would not start, they backed deceased's Lincoln to the front door of the office, loaded the body into the back seat, pushed off the Packard, and went to the home of Ashley's parents. Ashley's parents corroborated that Ashley was bruised and bleeding and that Lima had cuts and bruises on her thighs when they arrived, and that the appellants said that they had been in a fight when asked what had happened.

The appellants then related that they threw the deceased's clothing in various parts of the city, dumped the body and set fire to it, put the Packard license plates on the Lincoln, and began their flight which ended with their arrest in New York City.

The appellants both testified that they were in fear of their lives during the struggle with the deceased in his office, and that

they had gone to his office only for the perverted purposes but that when they realized how this would look to others they "panicked" and fled. They further testified that the various items of deceased's property were taken only because they knew that they would need money for their flight, and that they did not know of the $115 in deceased's billfold until they found it where it had fallen on the floor of the Lincoln. The appellants also testified that the pistol had been purchased because of trouble with teen-age boys with whom the appellants had been engaging in various sexual acts, and a policeman corroborated that he had been called to the appellants' apartment about February 3, 1961, because of trouble there.

■ The appellants' contention that they killed the deceased in self defense and in defense of each other was properly submitted to the jury, but rejected by them, and the evidence is sufficient to support their verdict.

The appellants urge error because of the admission of a portion of a telephone conversation between the deceased and his wife over their objection that it was hearsay and prejudicial.

That portion complained of occurred when the wife arrived home from work about 5 P.M., telephoned deceased at his office about two blocks away, and he told her "to figure on having dinner at 6 o'clock".

The appellants testified that the deceased was using the telephone when they arrived at his office at 5 P.M., and Lima stated that they left about 6:30 P.M., ten minutes after the killing which they both admitted.

■ The statement objected to was not itself inculpatory and, as used, was not reasonably calculated to prejudice the rights of the appellants. No reversible error is shown.

By formal bill of exception, the appellants strenuously contend that the trial court erred in refusing to grant a mistrial following the outcry of deceased's widow during the jury argument by appellants' counsel.

The bill recites that while appellants' counsel was presenting his argument the following occurred:

Appellant's Counsel: "* * * don't you know that they would have had every member of the ———— (deceased's) family to say, why certainly not, Daddy came home at 6:00 o'clock that evening and he had a cocktail and he put on his houseshoes and he watched television * * *"

Deceased's Widow (speaking from among the courtroom spectators): "And he certainly did; he was with me at the Ben Milam Hotel."

Appellant's Counsel: "If it please the Court, we move for a mistrial on the basis of this outcry."

The Court: "Overruled."

Appellant's Counsel: "And note our exception, please."

The trial court, without request, immediately instructed the jury to disregard the statement and the incident for any purpose whatsoever, and the bailiff promptly escorted deceased's widow from the courtroom. According to the bill, the spectator "spoke out in a voice which was barely audible", and "the words used by her were not entirely discernible by the court". The occurrence lasted only some thirty seconds and argument was resumed and concluded without further interruptions.

■ This Court held in Guse v. State, 97 Tex.Cr.R. 212, 260 S.W. 852, that probability of injury to the appellant is essential to vitiate the jury's verdict because of the conduct of bystanders. In determining such probability, each case depends on its own environments. Long v. State, 59 Tex.Cr.R., 103, 127 S.W. 555; 1 Branch's Ann.P.C.2d 423, Sec. 400.

■ The record in this case shows that the context of the widow's statement did not contradict the appellant's testimony relating to certain activities between them and the deceased at the time mentioned in the argument. Further, the trial court acted promptly and instructed the jury not to consider such matters. In view of these circumstances, there appears no reasonable probability of injury, and no reversible error is shown.

Appellants complain of the refusal by the trial court to admit the testimony of the witness Billingsley concerning the deceased's reputation for chaste character.

■ There is no showing of what the answer of the witness Billingsley would have been had he been permitted to testify. Hence, no error is shown.

Appellants also complain of the trial court's refusal to admit testimony relating to a specific act of sexual aggressiveness by the deceased.

■ There is no proof that the specific act inquired about was known to and influenced the appellants in killing the deceased. The refusal of its admission in evidence was not error.

It is insisted that the trial court erred in admitting the oral statements made by the appellant Lima to F.B.I. Agent Reuther, after her arrest in New York, that the trouble at deceased's office was caused by either physical assault, blackmail, or insult. Appellants contend that no proper predicate was laid authorizing the admission of the oral statements because the officers already had the Lincoln automobile in their possession prior to Lima's arrest.

■ From the record it is apparent that the oral statements were a part of the same conversation in which Lima told Agent Reuther about the keys to the Lincoln automobile and, for the reasons set forth below, became admissible.

Testifying at the trial, Lima stated that she had the keys to deceased's Lincoln automobile in her purse when arrested and that later when her purse was emptied on a desk during an interview with Agent Reuther, she was asked to identify the objects on the desk. These objects consisted, among other things, of several keys, and she pointed out and identified certain keys, saying they were the keys to deceased's Lincoln automobile.

The evidence shows that Agent Reuther first saw the keys when Lima's purse was emptied on the desk after her arrest, and that he then had no knowledge to what automobile the keys belonged. These keys were subsequently found to fit the ignition of deceased's Lincoln automobile. This evidence is sufficient to show that the Lincoln automobile had recently been under the control and in the possession of the appellants.

Art. 727 Vernon's Ann.C.C.P. authorized the admission of such oral statements "when they are found to be true and conduce to establish the guilt of the accused". This statute has been construed in Valtiero v. State, Tex.Cr.App., 219 S.W.2d 73, as authorizing the introduction of an oral confession of the accused as to the whereabouts of the hat of the deceased when the body of the deceased had already been found by the officers. There, this Court said, "The officers had no knowledge of its (the hat's) whereabouts." The officers in the case at bar had no knowledge concerning the keys. The opinion continues, "The facts here present demonstrate that facts and circumstances may be stated by an accused which unquestionably are inculpatory and conduce to establish his guilt, and yet neither lead to the recovery of stolen property, or the instruments with which the offense was committed." See also Hamon v. State, 135 Tex.Cr.R. 347, 119 S.W.2d 1057; Mohler v. State, 98 Tex. Cr.R. 238, 265 S.W. 553; and Ortiz v. State, 68 Tex.Cr.R. 524, 151 S.W. 1056.

Under the facts and circumstances of this case, the oral statements complained of were authorized to be admitted into evi-

dence, and no error is reflected in their admission.

The judgments are affirmed.

Opinion approved by the Court.

On Appellants' Motion for Rehearing

DICE, Commissioner.

Appellants insist that we were in error in our holding that the admission in evidence of that portion of the telephone conversation between the deceased and his wife at about 5 o'clock, p. m., on the day of the killing, in which the deceased told his wife "to figure on having dinner at 6 o'clock," over the objection that the same was hearsay and prejudicial, did not constitute reversible error. Appellants insist that the admission of such evidence constituted reversible error because it presented to the jury statements made by the deceased which were unknown to appellants and which struck at the very heart of their defense that they went to the deceased's office for the purpose of having a sexual date.

In support of their contention, appellants rely upon the early case of Brumley v. State, 21 Tex.App. 222, 17 S.W. 140, where it was held that proof of the deceased's undisclosed reason or motive in being where he was, or in going to the scene of the homicide, is not admissible against an accused where it tends to affect his defensive theory. Reliance is also had by appellants upon the recent case of Marshall v. State, 168 Tex.Cr.R. 569, 330 S.W.2d 625, where similar proof was condemned by this court under the holding in Brumley, supra. In their brief, appellants concede that under an exception to the rule, proof of movements of the deceased not known to a defendant which is merely explanatory of his presence at the scene of the killing is admissible where such proof does not affect a defensive theory. See: Bazanno v. State, 60 Tex.Cr.R. 507, 132 S.W. 777.

■ While appellants' objection to the telephone conversation as being hearsay was well taken, we remain convinced that, under the record presented, the admission of such evidence does not present reversible error. Proof that the deceased indicated in the telephone conversation with his wife at 5 o'clock, p. m., that he would be home around 6 o'clock, p. m., did not controvert appellants' defensive theory that they went to the deceased's office at 5 o'clock, p. m., to fulfill a prearranged sexual date. There is no proof that the sexual date would be of such duration that it could not have been completed and the deceased be at his home around 6 o'clock, p. m. Furthermore, the proof that the deceased indicated to his wife in the telephone conversation that he would be home around 6 o'clock, p. m., may have been beneficial to appellants and have supported their defensive theory that they went to his office to fulfill the prearranged sexual date, in that it could be construed as an effort on deceased's part to keep his wife from coming to his office while the sexual date was being consummated.

Appellants further insist that we were in error in holding that, under the facts, no probability of injury was shown as a result of the outcry of the deceased's widow, made during the argument of appellants' counsel. As shown in our original opinion, while appellants' counsel was arguing that if it were not true that on Saturday night before the killing on Monday the deceased was with appellants, the members of the Tones family would have said he came home at 6 o'clock that evening, she stated: "And he certainly did; he was with me at the Ben Milam Hotel." Appellants especially take us to task for the statement in our opinion: "The record in this case shows that the context of the widow's statement did not contradict the appellants' testimony relating to certain activities between them and the deceased at the time mentioned in the argument." Appellants further point to certain testimony in the record

to the effect that on the Saturday night in question the deceased was with them and on such occasion did go to their apartment to have sexual relations with Carolyn Lima.

While such was the evidence adduced and the statement in our opinion is subject to correction, we remain convinced that the widow's outcry, under the record, does not call for a reversal of the convictions. Whether the deceased was at the Ben Milam Hotel with his wife, or with the appellants on Saturday night before the killing, such had no direct bearing upon the actual killing and the issue of self-defense interposed by the appellants. Appellants admitted shooting the deceased and their only defense was that of self-defense. The widow's outcry had no bearing upon such issue and, clearly, no probability of injury is shown.

We again overrule appellants' remaining contention that the court erred in refusing to admit testimony offered by them relating to a specific act of sexual aggressiveness by the deceased. As stated in our original opinion, there was no proof that the specific act inquired about was known to or influenced the appellants in killing the deceased. The case of Newchurch v. State, 135 Tex.Cr.R. 619, 121 S.W.2d 998, supports the trial court's action in excluding such testimony.

The authorities cited by appellant in support of their contention that such testimony was admissible to corroborate and support their theory and claim that the killing was because of the sexual aggressiveness of the deceased are not here controlling. In the cases cited it was shown that the accused either had knowledge of the prior similar act and was seeking to corroborate such knowledge, or there was a disputed issue as to whether the deceased committed the act or acts relied upon as a basis of the accused's defense, at the time of the killing. Here, there was no proof that appellants had any knowledge of the prior act of sexual aggressiveness of the deceased and their testimony as to his sexual aggressiveness on the day of the killing was in no way disputed.

Remaining convinced that a proper disposition was made of the case in our opinion on original submission, the motion for rehearing is overruled.

Opinion approved by the Court.