IN THE COURT OF CRIMINAL APPEALS


OF TEXAS







NO. 74,258






JESUS FLORES, Appellant



v.



THE STATE OF TEXAS






APPEAL FROM 


 HARRIS COUNTY





 Per curiam.



 On May 22, 2001, Harris County Sheriff's Deputy Joseph Dennis responded to a
call concerning a damaged or stolen vehicle at the Flores residence. While speaking to the
appellant's family, Dennis saw the appellant pass by the house in another vehicle. Deputy
Dennis got in his patrol car and followed the appellant; when Dennis caught up to the
appellant, he stopped the appellant's vehicle. Dennis frisked the appellant, but overlooked a
small pistol the appellant had in his pocket. At some point during the stop, the appellant
shot Dennis in the head and fled the scene. Dennis died as a result of the gunshot to his
head.

 The appellant was convicted of capital murder. (1) Pursuant to the jury's answers, the
trial court sentenced the appellant to death. (2) Direct appeal to this court is automatic. (3) On
appeal, the appellant raises fifteen points of error; one point relates to jury selection, three
points address issues during the guilt stage, and the remaining eleven points relate to
punishment-stage issues. We affirm.

I. Jury Selection

 The first point of error in the appellant's brief is that he "was denied his
constitutional right to equal protection by the State's use of a peremptory strike on
venireperson Juan Amaya in a racially discriminatory manner." (4) The appellant claims that
the State violated Batson (5) by striking Amaya.

 A Batson challenge generally gives rise to a three-step process. First, the defendant
must make a prima facie case that a venire member was peremptorily excluded on the basis
of race. Jasper v. State, 61 S.W.3d 413, 421 (Tex. Cr. App. 2001). Next, the prosecution
must come forward with race-neutral reasons for the peremptory strike. Finally, the
defendant has the opportunity to rebut the State's explanations. The burden of persuasion
remains with the defendant to prove purposeful discrimination. Id.

 Here, during voir dire, the following exchange between the prosecutor and Amaya
occurred:

 [PROSECUTOR]: And can you kind of just tell me, in your own words,
what are your feelings about the death penalty?



 [AMAYA]: Well, it's kind of hard to say that. How come--what you
said right now?


 [PROSECUTOR]: [The questionnaire] says: What are your feelings about
the death penalty?


 Let me ask you another question. Here it says: What

 purpose do you think the death penalty serves in our

 society? What purpose do you think that there is for

 having the death penalty?

 

 [AMAYA]: What purpose? I have no idea.


 . . . 


 [PROSECUTOR]: Okay. If someone was found guilty of capital murder,
where they're charged - it's alleged that they shot and
killed a police officer in the line of duty, okay? And if a
jury finds them guilty, what would the jury have found
that they did?


 If you're sitting on a trial and we allege that the person
on trial, the Defendant sitting over here, shot and killed
a police officer in the line of duty and you and the other
jurors go back and find the Defendant guilty, can you
tell me what the jury has decided that the Defendant did?


 [AMAYA]: I don't understand. (6)


After the prosecutor finished questioning Amaya, the prosecutor challenged him for cause
because of Amaya's limited understanding. The trial judge noted that she would question
Amaya further. The prosecutor then exercised a peremptory challenge against Amaya. The
trial judge stated: "I'll say for the record that the juror did appear to have a very limited
understanding of the process and did look confused and looking around the room as if
looking for answers." (7) The appellant then objected on Batson grounds to the State's use of
a peremptory strike against Venireperson Amaya on the ground that both Amaya and the
appellant are Hispanic males. The appellant cited to another venireperson, Jerry Hall, who
"filled out possibly even less of his questionnaire, was not a Hispanic male, but had
absolutely no understanding, even after the law was repeatedly explained to him. . . and he
was accepted by the State." (8) The trial judge stated that she differed with the appellant's
characterization of Hall and stated that she believed Hall had a better understanding of the
law and concepts than the appellant argued. The State responded that Amaya had been unable
to verbalize his feelings about the death penalty, had a limited command of the English
language, and seemed confused about the proceedings. The trial court found that the
appellant failed to make a prima facie case of discrimination and that the State proffered a
race-neutral explanation for its use of a peremptory strike on Amaya.

 None of the prosecutor's explanations for striking Amaya reflect an inherently
discriminatory intent. The appellant also did not attempt to rebut the State's reasons. The
trial court's finding that the State's explanations were race-neutral is supported by the
record and is not clearly erroneous. Point of error one is overruled.

II. Guilt-stage Issues

 The appellant's complaints include two points that his audiotaped statement was
involuntary and inadmissible, and one point about the trial court's failure to charge the jury
on the lesser-included offense of aggravated assault of a peace officer.

A. Audiotaped Statement

 The second point of error in the appellant's brief is that his "audiotaped statement
was involuntary and inadmissible pursuant to the Fifth Amendment of the United States
Constitution." (9) His third point, which complains of the same error, is different only in that
it invokes Article I, Section 10 of the Texas Constitution. (10) In both points, the appellant
argues that "he was convinced to incriminate himself by being led to believe he had a legal
justification for his conduct." (11)

 "[A] defendant in a criminal case is deprived of due process of law if his conviction
is founded, in whole or in part, upon an involuntary confession, without regard for the truth
or falsity of the confession, and even though there is ample evidence aside from the
confession to support the conviction." Jackson v. Denno, 378 U.S. 368, 376 (1964).
Coercive police activity is a necessary predicate to the finding that a confession is not
"voluntary." Colorado v. Connelly, 479 U.S. 157, 167 (1986). A court must determine
whether the defendant's will was overborne by the circumstances surrounding the
confession. Dickerson v. United States, 530 U.S. 428, 434 (2000). It must take into
consideration the totality of all the surrounding circumstances, including both the
characteristics of the accused and the details of the interrogation. Id. The defendant has a
right to object to the use of the confession and the right to a hearing to determine whether
the confession was voluntary. Jackson, 378 U.S. at 377. The trial court is the sole fact-finder at the hearing and may choose to believe or disbelieve any or all of the witnesses'
testimony. Alvarado v. State, 853 S.W.2d 17, 23 (Tex. Cr. App. 1993). This Court
generally will not disturb any factual finding which is supported by the record. Id. During
the hearing on the appellant's motion to suppress his statement, Harris County Sheriff's
Department Detective Wayne Kuhlman testified that he and fellow detective Gregg Pinkins
took the appellant to an interview room after the appellant had been arrested. Kuhlman and
Pinkins turned on an audiotape recorder in the room and read the appellant his rights under
Miranda. (12) At the beginning of the interrogation, the appellant acted as if he were
intoxicated, stating he had been taking Xanax for several days and had taken "Ecstasy" two
days earlier. He denied any knowledge of the circumstances surrounding Deputy Dennis's
death, saying he did not remember what happened. When the detectives pressed him for an
answer about why he was apprehended wearing Deputy Dennis's handcuffs and confronted
him with the fact that his gun was used to shoot Deputy Dennis, the appellant slowly started
to give details about the events leading up to Deputy Dennis's death. He related that Deputy
Dennis pulled him over, tried to handcuff him while forcing him against the hood of his car,
and tried to hit him -- all without any reason. The following exchange occurred:

 [APPELLANT]: He had no reason to fuck with me. I went down the
street. I parked my car -- I backed up, and I went back.
What was his reason for following me?

 

 [DETECTIVE PINKINS]: Well, I don't know. But you know, if he -- you know, I
don't know. If he was fucking with you for no reason,
then, you know, we want to know that. That's what we
want to know. That's what we're asking you right now,
what happened. If he was fucking with you for no reason,
then we want to know that that's what was fucking going
on, plain and simple.

 

 [APPELLANT]: It ain't no difference.

 

 [DETECTIVE PINKINS]: What you mean it's no difference bro?

 

 [APPELLANT]: So, that's self-defense or something if the mother
fucker started fucking with me?

 

 [DETECTIVE PINKINS]: Get it off [your chest], it very well could be.


 After further discussion, the appellant asked the detectives to turn off the tape
recorder. After several minutes, the tape recorder was turned back on with the appellant's
consent. The appellant acknowledged that he still understood his rights and then gave a full
confession admitting that he shot Deputy Dennis during a traffic stop.

 The appellant claims that his statement should have been excluded because Detective
Pinkins misled him to believe that he could be found not guilty by reason of self-defense.
However, it was the appellant who suggested that his actions could have been attributed to
self-defense. Detective Pinkins's answer that "it very well could be" was not an affirmative
statement that the appellant's actions were justifiable or that he would be relieved of any
responsibility based on the theory of self-defense. Therefore, the appellant was not
"tricked" as he claims. Even if he had been, his statement would not necessarily be ruled
involuntary. See Brown v. State, 98 S.W.3d 180, 187 (Tex. Cr. App. 2003) (citing Green v.
State, 934 S.W.2d 92, 99-100 (Tex. Cr. App. 1996)).

 The appellant also suggests that he was easily deceived by Detective Pinkins because
he was intoxicated, fatigued, and was suffering from a dog bite that was inflicted when
police apprehended him. The appellant does not indicate how his dog bite or fatigue
rendered his statement involuntary. At the hearing on the motion to suppress, Detective
Kuhlman testified that when the interview began, the appellant feigned intoxication; he had
spoken with other officers who had been in contact with the appellant prior to the
interrogation who maintained that the appellant was "coherent, responsive, paying close
attention, and did not appear to be impaired."

 The trial court found that the appellant was properly admonished as to his rights, that
he was not intoxicated when he gave his statement, that the tape recording was accurate, that
he was arrested pursuant to a warrant, that he did not ask for an attorney, that he did not ask
to terminate the interview, and that he was not made any promises or inducements in
exchange for his statement. For all of these reasons, the trial court concluded that the
appellant gave his statement voluntarily. The trial court's findings are supported by the
record. Points of error two and three are overruled.

B. Instruction on Lesser-Included Offense

 In his fourth point, the appellant argues that "he was deprived of his constitutional
right to due process by the trial court's refusal to charge the jury on the lesser-included
offense of aggravated assault of a peace officer." (13) 

 There is no dispute in this case that the appellant shot Deputy Dennis and that the
result was Deputy Dennis's death. The only issue is whether the appellant caused Deputy
Dennis's death intentionally, knowingly, or recklessly. In Jackson v. State, we held that a
murder defendant is not entitled to an instruction on the lesser-included offense of
aggravated assault when the evidence shows that the defendant was guilty, at the very least,
of homicide. 992 S.W.2d 469, 475 (Tex. Cr. App. 1999). In a case where death occurs and
intent to kill is the only disputed issue, the only lesser-included offense available is
manslaughter, not aggravated assault. Id. Point of error four is overruled.

III. Punishment-stage Issues

A. Death Videotape 

 In his fifth point of error, the appellant complains that he was "deprived of
fundamental due process when the trial court admitted into evidence a 'death' videotape[,]"
which showed Deputy Dennis lying on the ground after being shot and the actions of
paramedics attempting to save his life. The appellant objected to the admission of the tape
as irrelevant, not probative, and "extremely prejudicial." (14) The State argued that the tape was
probative as to mitigation, not overly gruesome, and was admissible as victim-impact
evidence. (15) The trial court withheld its ruling so the tape could be viewed overnight. The
next day, the trial court overruled the appellant's objection and admitted the tape into
evidence. The appellant then objected that the audio portion of the tape should be excluded
because it constituted unsworn testimony. The trial court sustained the objection and ruled
that should the jury wish to view the tape, the bailiff would be present in the jury room to
insure the audio portion would not be played. The State chose not to play the videotape
during the punishment phase of trial. It left the decision to watch the tape to the jury.

 When the jury began deliberations, they sent a note to the judge asking for all of the
evidence. The appellant concedes that the record does not reflect that the videotape was
ever delivered to the jury room. In fact, the record does not reflect whether the jury room
even had a VCR. The bailiff was never called into the jury room, and there is no evidence
the jury ever viewed the tape. The appellant's claim must fail because the record does not
reflect he was harmed by the admission of the videotape. Point of error five is overruled.B. Attendance of Uniformed Law Enforcement Officers The sixth point of error in the appellant's brief is that he "was denied his
constitutional rights to due process and a fair trial by the attendance of a disproportionate
number of uniformed law enforcement at the punishment phase of the trial." (16) The seventh
point is a related complaint -- that the "appellant was deprived of his right to due process
by the trial court's refusal to permit him to videotape the 'show of force' present in the
courtroom gallery." (17)

 Before arguments, the appellant filed a motion to limit the number of uniformed
officers allowed in the courtroom because the "badges, guns and uniforms created a
prejudicial effect that could be intimidating to the jury." (18) The trial court denied the
appellant's request to limit the number of officers and stated:

 THE COURT: Let me just make it clear for the record that I'm looking at the
audience. There is no intimidation from my perspective on the
part of the police officers. The crowd is not overwhelmingly
represented by police officers. There are quite a few but there
are many, many civilians.


The appellant also requested that he be allowed to videotape the gallery. The trial court
denied the appellant's request to videotape the gallery; however, the court did give
permission to the appellant to "look at the audience and give a number."

 In order to prevail on a claim of prejudice resulting from external influence on the
jurors, the appellant must show either actual or inherent prejudice. The test to determine
actual prejudice is whether the jurors actually articulated a consciousness of some
prejudicial effect. Howard v. State, 941 S.W.2d 102, 117 (Tex. Cr. App. 1996). To
determine inherent prejudice, we look to whether "an unacceptable risk is presented of
impermissible factors coming into play." Holbrook v. Flynn, 475 U.S. 560, 570 (1986).
Inherent prejudice rarely occurs and "is reserved for extreme situations." Id. "We have long
held that spectator conduct or expression which impeded normal trial proceedings would
not result in reversible error unless an appellant showed a reasonable probability that the
conduct or expression interfered with the jury's verdict." Id.; Landry v. State, 706 S.W.2d
105, 112 (Tex. Cr. App. 1985).

 The appellant does not show actual prejudice because the jurors did not indicate that
they were influenced by the presence of the peace officers. Likewise, the appellant is
unable to show inherent prejudice because the record reflects the peace officers did not
engage in any conduct or expression which would have interfered with the jury's verdict.
Point of error six is overruled.

 The appellant also fails to demonstrate error in the trial court's refusal to allow him
to videotape the gallery. He argues that he was entitled to videotape the gallery because in
Howard, this Court "complained at length about the sparseness of the record" and implied
that we failed to find prejudice because of the lack of empirical data regarding the number
of peace officers present. Howard, 941 S.W.2d at 117-18. The appellant misreads our
Howard opinion. In that case, we rejected the appellant's claim of prejudice because he was
unable to show that the jurors had articulated a sense of intimidation by the officers'
presence or that the officers engaged in conduct or expression which would have affected
the jury's verdict, not because the appellant had failed to show the number of officers
present. Id. In fact, the trial court in Howard stated on the record, and we noted in our
opinion, that there were twenty uniformed officers present in the gallery. Id. The lack of a
videotape or any other data regarding the number of officers had no bearing in Howard.
Furthermore, in the instant case, the trial court permitted the appellant to make a headcount
of those present in the gallery. The record does not indicate that the appellant did so. Point
of error seven is overruled.

C. Punishment Argument 

 In his eighth point of error, the appellant argues that he was "deprived of due process
by the prosecutor's improper punishment argument that encouraged the jury to ignore the
future in answering [special] issue number one." (19) During jury argument at the punishment
phase of trial, the following transpired:

 [THE PROSECUTOR]: Do you find from the evidence, beyond a reasonable
doubt there's a probability -- we talked about it meaning
more likely than not -- that the defendant would
commit criminal acts of violence that would be a
continuing threat to society? Not, would he commit
criminal acts of violence after serving 40 years in the
penitentiary on a life sentence. That's not what the
question asks, because that would be putting the answer
into the question. As the defendant sits here this day, do
you find from the evidence beyond a reasonable doubt
there is a probability he would commit criminal acts of
violence that would constitute a continuing threat to
society.


 [DEFENSE COUNSEL]: Excuse me, Your Honor, I have to object to the
misstatement of the law that the 40 years is not
considered in the law talking about future
dangerousness.


The trial court overruled the objection. The appellant contends that the prosecutor's
argument prevented the jury from considering whether or not the appellant could be
rehabilitated in the future. We disagree. The record reflects that the prosecutor was simply
arguing that the jury should consider whether the appellant would be a danger in the
immediate future, not whether he would be a danger forty years down the road. This is not a
misstatement of the law. (20) Point of error eight is overruled.

D. Indictment

 In his ninth point of error, the appellant claims that "the failure of the indictment to
allege a probability that appellant would commit criminal acts of violence that would
constitute a continuing threat to society precluded the death penalty as a sentencing
option." Essentially, the appellant claims the indictment was fundamentally defective
because it did not allege future dangerousness. He relies on Apprendi v. New Jersey, 530
U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002), to support his contention.

 Apprendi requires any fact, other than a prior conviction that increases the penalty
for a crime beyond the prescribed statutory maximum, be submitted to a jury and proved
beyond a reasonable doubt. Apprendi, 530 U.S. at 490. Ring requires any fact other than a
prior conviction that increases the maximum penalty be alleged in the indictment and
proved beyond a reasonable doubt. Ring, 536 U.S. at 600. Both cases focus on facts which
will increase punishment over the statutory maximum. The statutory maximum punishment
in a capital murder case is death. (21) Including the issue of future dangerousness in the
indictment would not allow the State to seek a more severe punishment. Accordingly,
Apprendi and Ring do not apply. The appellant's ninth point of error is overruled.

E. Burden of Proof on Mitigation Special Issue

 In his tenth point of error, the appellant argues that Code of Criminal Procedure
Article 37.071, Sections 2(e) and 2(f) are unconstitutional because they place the burden
of proof on the defendant to prove mitigation with respect to the second special issue. (22)
Nothing in the statute requires the defendant to prove mitigation. (23) We have previously
rejected this identical claim. Busby v. State, 990 S.W.2d 263, 272 (Tex. Cr. App. 1999).
Point of error ten is overruled.

F. Value of Life of Peace Officer

 The eleventh point of error in the appellant's brief is that "Sec[tion] 19.03(a)(1) [of
the] Tex[as] Penal Code is unconstitutional for assigning inherent superior worth to a
police officer solely by virtue of profession." (24) The appellant points to nothing, other than
his bald assertion, to support his contention. As such, this point of error is inadequately
briefed. Tex. R. App. Proc. 38.1(h). Point of error eleven is overruled.

G. Order of Punishment Argument

 In his twelfth point of error, the appellant complains that he was "denied due process
by the trial court's refusal to permit the defense to submit final or rebuttal argument on
mitigation." (25) He claims that because he had the burden of proof to show mitigation, he
should have been allowed to close the arguments. His argument is premised on the
assertion that he has the burden of proof on the mitigation special issue. However, as
discussed in point of error ten, the appellant does not have the burden of proof with respect
to mitigation. (26) Therefore, the trial court did not abuse its discretion in refusing the
appellant's request to argue last. Point of error twelve is overruled. 

H. Anti-Sympathy Instruction

 The thirteenth point in the appellant's brief is that he "was denied due process by the
trial court's refusal to exclude the 'anti-sympathy' instruction from the jury charge." (27) He
specifically objects to the trial court's admonition, in the punishment charge, that the jury
not be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public
opinion, or public feeling in considering all the evidence." The appellant maintains that this
"anti-sympathy" charge misled jurors into thinking that it would be improper for them to
consider sympathy based on mitigating evidence, which might ultimately have led them to
conclude that a life sentence was more appropriate than death. This argument has previously
been rejected. Tong v. State, 25 S.W.3d 707, 710-11 (Tex. Cr. App. 2000) cert. denied,
532 U.S. 1053 (2001). Point of error thirteen is overruled.

I. Jury Instructions in Punishment Charge

 In his fourteenth point of error, the appellant complains that he "was denied due
process by the trial court's refusal to provide the jury a less confusing alternative for
answering the special issues." (28) The appellant wanted to include two jury instructions in the
punishment charge. The first instruction he requested advised the jury not to answer special
issue number one or sign the jury form unless the jury's answer was unanimous; the second
would have advised the jury not to answer special issue number two unless at least one, but
fewer than ten jurors, were able to answer "yes." The trial judge refused the appellant's
request. Such refusal, according to the appellant, "unconstitutionally subjected him to an
unreliable verdict, contrary to the Texas and United States Constitutions."

 The appellant contends that his requested instructions are supported by the reasoning
of this Court in McFarland v. State, 928 S.W.2d 482, 522 (Tex. Cr. App. 1996), cert.
denied, 519 U.S. 1119 (1997). Appellant misreads McFarland. In McFarland, we stated
that the appellant's requested instruction was not required because a similar instruction had
been given. Id. at 522. Here, the appellant received the statutory charge in this case. See
Tex. Code Crim. Proc. art. 37.071, §§ 2(d)(2), 2(f)(2). Therefore, the trial court did not
err in refusing his request to include the supplemental instructions. Point of error fourteen
is overruled.

J. Definition of Reasonable Doubt.

 In his fifteenth point of error, the appellant claims that the trial court erred in
denying his request to instruct the jury on the definition of reasonable doubt as applied to
the first special issue. (29) At the punishment phase of trial, the appellant asked the State to
agree to the instruction pursuant to Paulson v. State, 28 S.W.3d 570 (Tex. Cr. App. 2000)
(holding that a reasonable doubt instruction is not required but can be used if both parties
agree). The State refused. The appellant now asks this court to overrule Paulson and require
a reasonable doubt instruction, whether the parties agree or not, under our previous holding
in Geesa v. State, 820 S.W.2d 154 (Tex. Cr. App. 1991). We see no reason to overrule
Paulson. Point of error fifteen is overruled.

 We affirm the judgment of the trial court.


En banc.

Delivered: October 20, 2004

Do Not Publish.
1. Tex. Penal Code § 19.03(a). 
2. Tex. Code Crim. Proc. art. 37.071, §§ 2(b), (e), (g).
3. Id., § 2(h). 
4. Brief, at 5. 
5. Batson v. Kentucky, 467 U.S. 79 (1986). 
6. 13 Reporter's Record (RR) 127-30. 
7. 13 RR 131. 
8. 13 RR 131-34. 
9. Brief, at 23. 
10. Id.
11. Id., at 38. 
12. Miranda v. Arizona, 384 U.S. 436 (1996). 
13. Brief, at 42. 
14. 25 RR 169-71. 
15. Id. 
16. Brief, at 60. 
17. Id., at 70. 
18. 25 RR 188. 
19. Brief, at 73. 
20. See Tex. Code Crim. Proc. art. 37.071, § 2(b)(1) ("On conclusion of the
presentation of the evidence, the court shall submit the following issues to the jury: (1)
whether there is a probability that the defendant would commit criminal acts of violence
that would constitute a continuing threat to society . . .")
21. See Tex. Penal Code § 19.03(b). 
22. Brief, at 90. 
23. See Tex. Code Crim. Proc. art. 37.071, §§ 2(e),(f). 
24. Brief, at 95. Penal Code Section 19.03(a)(1) provides that "a person commits an offense [of
capital murder] if he commits murder as defined under Section 19.02(b)(1) and: (1) the person murders
a peace officer or fireman who is acting in the lawful discharge of an official duty and who the person
knows is a peace officer or fireman; . . ."
25. Brief, at 97. 
26. See Tex. Code Crim. Proc. art. 37.071, §§ 2(e),(f). 
27. Brief, at 100. 
28. Id., at 103. 
29. Id., at 106.