**Raymond LANDRY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69172.**

Court of Criminal Appeals of Texas,
En Banc.

Dec. 11, 1985.

Rehearing Denied March 19, 1986.

John B. Holmes, Jr., Dist. Atty., and James C. Brough and John Holleman, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CAMPBELL, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A. Penal Code, § 19.03(a)(2). After finding appellant guilty, the jury returned affirmative findings to the special issues under Art. 37.071, V.A.C.C.P. Punishment was assessed at death. We affirm.

Appellant was convicted of causing the death of Kosmas Prittis by shooting him with a gun while in the course of committing and attempting to commit the offense of robbery. Appellant does not challenge the sufficiency of the evidence of guilt, therefore no recitation of the facts is necessary at this time.[1]

In Ground of Error No. 3 appellant complains that "the trial court erred in overruling appellant's motion to quash the indictment for its allegation of murder in the course of attempting to commit robbery."[2]

Appellant argues that since attempted theft is an element of robbery and not attempted robbery, there is no such offense as attempted robbery. Appellant concludes that the language in § 19.03(a)(2) of "in the course of ... *attempting to commit* ..." is vague as applied to robbery, and therefore, cannot support a capital murder indictment.

The State replies that this Court has, in the past, upheld capital murder indictments identical to the instant indictment in the face of a motion to quash. See *Hammett v. State*, 578 S.W.2d 699 (Tex.Cr.App.1979);

Catherine Greene Burnett, on appeal only, Wesley H. Hocker, Court appointed, Houston, for appellant.

1. Appellant in Ground of Error No. 8 does challenge the sufficiency of the evidence to support an affirmative finding to special issue No. 2. We will discuss the facts as relevant to that issue infra at pp. 11–13.

2. The indictment in pertinent part alleges that the appellant "on or about August 6, 1982, did then and there unlawfully while in the course of committing and attempting to commit the felony of Aggravated Robbery of Kosmas Prittis, hereafter styled the Complainant, intentionally cause the death of the Complainant by shooting the Complainant with a gun."

*Burns v. State,* 556 S.W.2d 270 (Tex.Cr. App.1977); *Smith v. State,* 540 S.W.2d 693 (Tex.Cr.App.1976); *Demouchette v. State,* 591 S.W.2d 488 (Tex.Cr.App.1979). These cases all stand for the proposition that it is unnecessary to allege the elements of the underlying felony in a capital murder indictment. Ground of Error No. 3 is overruled.

In Ground of Error Nos. 1 and 2, appellant alleges that the trial court erred in granting the State's challenge for cause of two venirepersons under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). See Appendix A, infra at pp. 113–115.

■ Both jurors expressed personal or religious scruples against the death penalty. Both jurors stated that they believed the death penalty to be inappropriate in most instances. While it was not impossible that they would answer the questions "yes," it was not probable. Finally, both jurors indicated that their personal beliefs would guide them in answering the special issues rather than the law. Under *Wainwright v. Witt,* —— U.S. ——, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), a prospective juror, whose personal views will prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath, may be constitutionally excluded. A juror who will ultimately be guided by his or her personal beliefs rather than the law is not qualified to sit on a jury in the State of Texas. We have reviewed both jurors' voir dire and have concluded under *Wainwright v. Witt,* supra, that the trial court did not err. See also, *Bird v. State,* 692 S.W.2d 65 (Tex.Cr. App.1985). Ground of Error Nos. 1 and 2 are overruled.

In Ground of Error No. 4 appellant alleges that "the trial court erred in allowing bolstering of the eyewitness testimony through a description of the lineup procedures and introduction of three photographs taken at the lineup."

Officer Doyle testified on direct examination by the State as to a line-up conducted at the Houston Police Department on August 9, 1982. Officer Doyle testified that he met with the five eyewitnesses to the instant crime, explained the line-up procedures, and observed the conduct of the eyewitnesses during the line-up to assure himself that the line-up procedures were followed. Appellant then objected to the testimony as bolstering the prior identification testimony of the five eyewitnesses. The trial court sustained appellant's objection; however, appellant did not move to strike the testimony or request a mistrial.

The State then offered into evidence three photographs of the individuals in the August 9th line-up. Appellant objected that the photographs bolstered the prior identification testimony of the five eyewitnesses. The trial court overruled the objection, and the photographs were admitted into evidence. The photographs were passed among the jury.

■ This Court stated the rule on bolstering eyewitness testimony in *Lyons v. State,* 388 S.W.2d 950, 951 (Tex.Cr.App. 1965):

> "... [A] witness who has identified her assailant at the trial may testify that she also identified him while he was in custody of the police, [but] others may not bolster her unimpeached testimony by corroborating the fact that she did identify him."

An eyewitness may also testify that prior to trial she saw a photograph of the defendant and identified him as her assailant, *Williams v. State,* 565 S.W.2d 937 (Tex.Cr. App.1978). However, a third party may not bolster an eyewitness' unimpeached testimony by corroborating the fact that she identified the defendant through a photograph.

■ Further, bolstering testimony which is erroneously admitted is reversible error unless admission of the testimony was harmless beyond a reasonable doubt. *Davis v. State,* 636 S.W.2d 197 (Tex.Cr.App. 1982).

■ In the instant case, Officer Doyle never testified that the five eyewitnesses identified appellant at a line-up as the person who committed the instant crime. At most, he testified that the eyewitnesses followed the proper procedures for conducting a line-up. We are not entirely convinced that such testimony constitutes bolstering of a prior identification. However, even assuming that the testimony of Officer Doyle constituted bolstering, appellant only offered an untimely objection, which was sustained. Appellant did not request further relief, such as a motion to strike the testimony, an instruction to disregard, or a motion for mistrial. Therefore, no error is preserved. *Williams v. State*, 549 S.W.2d 183 (Tex.Cr.App.1977); *Jones v. State*, 504 S.W.2d 906 (Tex.Cr.App.1974); *Washington v. State*, 484 S.W.2d 721 (Tex. Cr.App.1972).

■ Officer Doyle also never testified that the five eyewitness had identified the appellant from the individuals pictured in the three photographs of the line-up. We acknowledge that the admission of the three photographs of the line-up, in conjunction with Officer Doyle's testimony, may have created the inference that the five eyewitnesses identified appellant at the line-up. However, even assuming that the jury recognized such an inference, the error was harmless beyond a reasonable doubt.

Five eyewitnesses testified that they observed appellant commit the instant crime; the eyewitnesses further testified that they identified appellant in an extra-judicial line-up. They also identified appellant in a photo array and in the courtroom during trial. Officer Doyle never directly testified that the five eyewitnesses identified appellant at the line-up, and he never testified that the five eyewitnesses identified one of the individuals appearing in the three photographs. The combined effect of Officer Doyle's testimony and the admission of the three photographs, at most, offered implicit corroboration that a line-up took place. While this corroboration is improper, under the instant circumstances, it could not have

added any more credibility to the prior identification testimony. Officer Doyle's testimony and the three photographs were completely redundant evidence and, therefore, could not have influenced the jury on the issue of the identification of the appellant by the five eyewitnesses. Ground of Error No. 4 is overruled.

In Appellant's 5th Ground of Error he objects to the following jury argument of the prosecutor during the "guilt" phase of the trial:

"Now, what did the evidence show? Well, it's not very often—this is kind of, as I see it, a very unique type of robbery or capital murder case, because it's not very often that you have five eye witnesses to a capital murder case or a robbery case. It's very unique in that regard. It's not very often when you have, if you have five witnesses, that all five witnesses are going to be able to positively identify the defendant in either a line-up three days later or at the time the trial comes. That's a very, that's where this trial is very unique in that regard.

"It's not very often that in a capital murder or a robbery, that the witnesses have the opportunity to look at the defendant for the long length of time that our witnesses had in this case. Most capital murders or robberies occur much quicker than this."

"MR. HOCKER: Your Honor, I'm going to object to what most or what other crimes do and limit his argument to this case.

"THE COURT: That's overruled.

"MR. HOLLEMAN: Well, this case took over a period of minutes. First, approach the witnesses at the car, go to the back of the place, inside, come back out, a period of minutes they had to view the defendant under good lighting conditions and to make sure that when they saw him again at a later time that they would be able to identify him and not make a mistake, and that's somewhat unique in capital murders or robbery cases.

"It's not often that the police are able to trace the vehicle that was used in the getaway, the getaway vehicle to the defendant. And I'll discuss that a little bit later. But in this case, the testimony showed that the police were able to show that the defendant did own that vehicle. And it's not very often, it's kind of unique and it's not, well, in my mind where the police are able to recover some of the property in the house of the defendant that was actually taken in the robbery. We have all of those situations in this case.

"And lastly, it's very seldom you ever see where the defense witnesses shows the defensive theory just simply couldn't be true. This certainly is physically impossible for it to be true."

Appellant contends that the above argument involved facts outside the record and, for the first time on appeal, "involved consideration of the prosecutor's previous experience with cases weaker than appellant's which presumably resulted in capital murder convictions."

We agree that the prosecutor's reference to circumstances of "most" capital murder trials was outside the record and should not have been permitted. We further agree with both parties that *Mathews v. State*, 635 S.W.2d 532, 539 (Tex.Cr.App. 1982) does provide the proper standard for review:

"... [F]or reversible error to occur in jury argument it must be manifestly improper, or violates [sic] some mandatory statute, or some new fact harmful to the defendant's cause is thereby injected into the case."

We begin by noting that the argument did not violate any mandatory statute. To determine whether the argument was manifestly improper or injected a new fact harmful to defendant, we must determine its probable effect on the jury. Id., at 540.

We do not believe the remarks here complained-of in any way injured the appellant. The remarks amounted to a summation of the voluminous testimony against appellant. While the prosecutor should not

have referred to the evidence as unique when compared to "most capital cases", we fail to see how the jury might have relied upon these comments in light of the record as a whole. See *Duffy v. State*, 567 S.W.2d 197, 707 (Tex.Cr.App.1978). See and compare *Escobedo v. State*, 620 S.W.2d 590 (Tex.Cr.App.1981). Ground of Error No. 5 is overruled.

In Ground of Error No. 6 appellant complains that "numerous instances of improper jury arguments constituted cumulative reversible error despite lack of trial objection." Appellant details five short statements made by the prosecutor during closing argument of the guilt-innocence phase of the trial.

The first argument concerned defense witness Clay Stewart:

"We had the evidence of Clay Stewart. I want you to weigh and judge his evidence, put it up beside the evidence of the eye-witnesses and so on. First of all, even if you believe him, and I don't think many of you are or any of you are, *and I hope you don't*, but even if you believe him, what did he say?" (emphasis in original)

The second argument occurred during the prosecutor's discussion of his function in the case and referred to a prior unresponsive answer of Nicholas Prittis on cross-examination:

"My job is not to talk you into anything. My job and my prayer in this case is exactly the same one that Nicky told you Tuesday when he testified. He said he prayed Monday night that the truth would win, and that's all we're asking for, is that the truth wins."

The third argument occurred in the midst of a discussion of the testimony of eye-witness Sharon Burrell:

"Raymond Landry is no longer in the street where this could occur again."

The fourth argument concerned the deceased's justification for being proud of his family:

"I think Komas Prittis can look down from heaven and be proud of that family. And he wouldn't be up there proud if they were lying. That just makes two wrong[sic]."

The final argument which forms a basis of the instant ground of error was the repetition of the third argument complained of above:

"And once again, my prayer to you now is only the same thing that Nicky said, and that is, may the truth win."

■ The general rule is that any improper argument made by the state is waived by a defendant's failure to object. *Romo v. State,* 631 S.W.2d 504 (Tex.Cr.App.1982). An exception to this rule occurs where an argument is so prejudicial that, had the defendant objected, an instruction would not have cured the harm. *Romo,* supra.

■ It is generally understood that proper jury argument falls into one of four categories: (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) response to the defendant's argument, or (4) a plea for law enforcement. *Hughes v. State,* 563 S.W.2d 581 (Tex.Cr. App.1978).

Appellant relies upon a line of cases that found reversible error in the prosecutor's conduct during trial. *Stein v. State,* 492 S.W.2d 548 (Tex.Cr.App.1973); *Dexter v. State,* 544 S.W.2d 426 (Tex.Cr.App.1976); and *Boyde v. State,* 513 S.W.2d 588 (Tex. Cr.App.1974). These cases are wholly inapplicable to this cause for several reasons. First, in all three cases cited, the defendants objected to the conduct of the prosecutor. Secondly, the prosecutors were, by their actions, deliberately violating an express court order. Thirdly, in reversing the above cases, this Court relied upon prosecutorial misconduct so blatant as to border on being contumacious. We do not read appellant's ground of error to accuse the prosecutor of any such conduct. We find the above cases completely distinguishable.

Furthermore, in dealing with each instance of alleged improper argument, the appellant has failed to direct us to any case wherein this Court held such comments to be reversible error *without an objection.* In all the cases cited by appellant, there was an objection. See *Menefee v. State,* 614 S.W.2d 167 (Tex.Cr.App.1981); *Villalobos v. State,* 568 S.W.2d 134 (Tex.Cr.App. 1978). Assuming arguendo, that all five instances of argument alleged were in fact objectionable, the question becomes whether the combined effect was so prejudicial as to deny appellant a fair trial. See *Simpkins,* supra.

■ Appellant directs our attention to *McKenzie v. State,* 617 S.W.2d 211 (Tex.Cr. App.1981), wherein a panel of this Court stated that manifestly improper argument should be carefully considered and its prejudice determined when evidence of guilt is meager, though sufficient. The evidence supporting appellant's conviction is not "meager, but sufficient." In the instant case, the State presented five unimpeached eyewitnesses and showed that appellant possessed stolen property from the robbery. The evidence presented against appellant was overwhelming and not meager. We find that the five arguments did not prejudice appellant to the extent that he was denied a fair trial.

In Ground of Error No. 7 the appellant claims that "the trial court erred in denying a mistrial following the outbreak in the courtroom by the deceased's family during defense jury arguments, when the family had been previously admonished against similar conduct by the trial court."

During the testimony by family members at various stages of the trial, there were recesses to allow family members who were testifying to control their emotions before continuing. During the guilt-innocence stage of the trial, there was a confrontation between members of the complainant's family and appellant. The confrontation occurred outside of the jury's presence. The trial court admonished the family members and ordered them to avoid future outbursts.

During appellant's closing argument, the record reflects a commotion in the audience

of the courtroom. The judge retired the jury, and defense counsel moved for a mistrial and noted the following:

"(WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD OUT OF THE PRESENCE OF THE JURY.)

"THE COURT: All right, gentlemen. The jury has, of course, been retired. Can we proceed?

"MR. HOCKER: Yes, Your honor, I would like to bring to the court's attention for the record that during my argument, Your Honor, I was interrupted by an outburst from the audience by one, the wife of the deceased, Mrs. Prittis, and that she was in the process of fainting and leaving the courtroom; and that further there was an outbreak of, outcry from the brother of the deceased, that the jury certainly—I was standing by the jury rail and I heard it. He had been waiting nine long months for this and as, to me, those two outbursts are in direct contravention of the Court's earlier admonition to the members of this, the witnesses, subpoenaed to this trial, and I ask the Court to enforce that order and to declare a mistrial.

"THE COURT: Motion overruled.

MR. HOCKER: May I proceed, Your Honor?"

█ Conduct from bystanders which interferes with the normal proceedings of a trial will not result in reversible error unless the defendant shows a reasonable probability that the conduct interfered with the jury's verdict. *Ashley v. State*, 362 S.W.2d 847 (Tex.Cr.App.1963); *Guse v. State*, 97 Tex.Cr.R. 212, 260 S.W. 852 (1924). Injury to a defendant is measured on a case-by-case basis. *Id.*

In *Ashley*, supra, the widow of the deceased spoke out during defense counsel's final argument. We held that the outcry did not contradict the defendant's testimony and was promptly cured by the trial court's instruction to the jury. In *Guse*, supra, a sheriff interrupted defense counsel's final argument by denying that the defendant was entrapped. We held that the sheriff's statement was improper but

harmless because the defendant's defense did not depend upon evidence of entrapment.

In the instant case, appellant does not point to any particular verbal outcry as injuring him during trial. Instead, appellant claims that the emotional nature of family members throughout the trial injured his right to a fair trial.

█ While the direct confrontation between family members and appellant should have been avoided, it did not occur in the jury's presence and could not have affected their verdict. The testimony of the family members during trial, although done emotionally, was responsive to questions directed to them. In addition, the trial court recessed at several points to lessen the emotional nature of the testimony. The outbursts which occurred during final argument did not involve any verbal outcries as in *Ashley*, supra, and *Guse*, supra, and the jury was immediately removed. We do not believe that appellant has demonstrated how such emotional responses reasonably could have interfered with the jury's verdict. Ground of Error No. 7 is overruled.

In Ground of Error No. 8 appellant alleges that the evidence is insufficient to support an affirmative finding on Special Issue Two. Art. 37.071(b)(2), supra. We disagree.

The evidence conclusively and beyond a reasonable doubt showed that, after the deceased handed over a wallet containing over $2,000, the appellant shot him in the head. In addition, the State also presented evidence during the punishment hearing that appellant had been convicted of a burglary and had assaulted a police officer in resisting an arrest. Appellant's sister-in-law testified that she had witnessed appellant physically and emotionally abuse his five week old son. Another associate testified that appellant had accosted an individual on the street for no apparent reason. There was also evidence that appellant frequently carried a pistol.

█ In assessing punishment, the jury may consider all the evidence adduced

at trial on guilt or innocence. *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1978). The circumstances of the offense, if severe enough, can be sufficient for an affirmative answer to Special Issue No. 2. *Holloway v. State*, 691 S.W.2d 608 (Tex.Cr.App. 1984). Prior criminal convictions are probative of a defendant's propensity to commit future acts of criminal violence. *Felder v. State*, 564 S.W.2d 776 (Tex.Cr.App. 1978). Finally, the calculated nature of a defendant's criminal act and the aforethought with which he coldly planned and executed the crime is probative of his propensity to commit future acts of violence. *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr. App.1979).

■ The evidence in this case is overwhelming that the appellant killed the deceased in cold blood. One of the children testified that appellant had cocked his gun, ready to shoot the children, when the mother intervened. Appellant then slapped the mother, knocking her against the car. The evidence further showed one previous felony conviction and at least two prior instances of appellant's unhesitating use of violence. We find that the evidence is more than sufficient to support the jury's affirmative finding to Special Issue Number 2. Ground of Error No. 8 is overruled.

■ In his final ground of error appellant contends, for the first time on appeal, that the trial court erred in failing to submit Special Issue Number 3. Art. 37.-01(b)(3), supra. Appellant's claim is based upon a misreading of the record. Appellant claims that the deceased's niece testified that the wife of the deceased grabbed appellant immediately before the shooting. The record clearly indicates that, *after the deceased was shot*, the appellant approached the vehicle and was pointing the gun at the children, when Mrs. Prittis ran up and grabbed him. This ground of error is completely frivolous and without merit, as there is no evidence of provocation. Therefore, there was no error in failing to submit said issue. Ground of Error No. 9 is overruled.

The judgment of the trial court is affirmed.

CLINTON, J., dissents to overruling Ground of Error No. 8.

TEAGUE, J., dissents to Grounds of Error Nos. 1 and 2; see *Barney v. State*, 698 S.W.2d 114 (Tex.Cr.App.).

### APPENDIX A

1. *Potential Juror Adams*

Potential Juror Adams on direct examination stated:

"Q. Well, your belief right now. Are you the type of person who believes the death penalty is a necessary punishment, first of all?

"A. If there's no other alternative.

"Q. Well, there's always an alternative. Doing nothing is an alternative or doing something else is an alternative.

"A. Yes. No, I really don't think I could on death penalty, because, there's—I don't think I could. It's more or less a religious belief.

"Q. Okay.

"A. My own conscience, I don't think I could."

When defense counsel attempted to rehabilitate, he elicited the following response:

"Q. (By Mr. Hocker) If you can do it and follow the law, that's it. If, before every case before it started, I don't care what the facts show, I couldn't answer those questions 'yes', if I knew it was going to cause the man to be put to death, if that's your belief, you go home. But if you can consider the evidence, listen to all the evidence and then make that determination based upon answers to these questions, then you're qualified. It's fish or cut bait.

"A. Well, I would still have to go back to my former convictions, I really would, because so many, all of us know, if I may say what I feel.

"THE COURT: Yes.

"THE WITNESS: Men stay on Death row for years and years at taxpayers' expense. They sit there, and

some of them are never—how many years do they sit there? So what good is a sentence like this if a man has to go sit there for another how many years? This is what I don't understand about the law.

"Q. (By Mr. Hocker) I understand the system, but you have to presume now, and I think the State will agree with me that if you vote yes, yes to those answers and the Judge sentences the man to death, that that's a probability that that death sentence will be carried out; enter the case of Mr. Brooks who was executed here a couple of months ago. I mean as to him, it was finality. That sentence was carried out.

"A. Well, I'm thinking about the dentist in Pasadena, the Halloween man, this is the case I'm referring to, he's still there, that gave the candy to the young children, you know.

"Q. Right.

"A. Now, that is a situation that's close to home. I don't know him personally, but now he caused a death and he is still alive.

"Q. Yes, ma'am.

"A. And he was sentenced. This has been several years ago, and this is why I feel, you know, the sentence was applied and everything, and yet the man is still living.

"Q. And you could have given the death penalty in that case, could you not?

"A. Yes, because that was closer—no, no, no. I don't really think so, feeling like I do. I don't know. The facts would have to—

"Q. The facts would have to dictate whether you gave him the death penalty or not?

"A. True, true.

"Q. I'm asking you, if once you found a person guilty of capital murder, that you heard what his background is, how did he commit the crime, what was he doing, what was the manner and means of which he used to take the life of the person he killed and answer these questions based upon the law

and the evidence of the case as opposed to having your mind premade up, that you're going to answer each one of them no? Can you do that?

"A. No, I honestly feel that I would have to say no.

"Q. Okay. You're going to ignore the law.

"A. I think I'm going to have to live with myself.

"Q. And you say you are irrevocably committed before a trial has begun to vote against the penalty of death regardless of the facts and the circumstances that might emerge in the course of those proceedings?

"A. Yes."

### 2. *Potential Juror Askew.*

Potential Juror Askew, on direct examination, first established a life-long conviction against the death penalty. He then stated that he was becoming more "liberal", so that in some instances the juror believed that the death penalty was acceptable. After explaining the special issues, the Assistant District Attorney continued:

"Q. You knew based on the evidence that it was proper to answer this question 'yes', but you felt that that would be, at least in your opinion, an improper result, the death penalty, that what he did didn't deserve the death penalty; could you put that aside and make sure you answered this the proper way under the evidence and the law?

"A. Under specific circumstances, I could. Does that answer your question?

"Q. Okay. Under specific circumstances. It doesn't really say that you're able to pick the circumstances as to what—

"A. I know that.

"Q. It says you look at the evidence.

"A. I know what it says, but I figured you wanted to know what I felt in my heart and that's true.

"Q. Okay. You're telling me in your heart that you would not only—

"A. I can't tell you any more than just I have reservations about the death penalty in general. Logically you have taken me right through and I understand what you're asking and I also understand that you've caught me in a moment in my development where I'm not sure about my own beliefs in this area. And so I think I've been as clear as I'm able and I realize that that's not all that clear.

"Q. No, it is clear. But just to make sure I understood it, okay, you're saying that you realize that there might be a situation where you should answer this 'yes'—

"A. Yes.

"Q. —but your own feelings would be opposed to the result, would be the death penalty; so you're, unless it was a circumstance that agreed with your feeling of when somebody should receive the death penalty, you're not sure you could answer this 'yes'?

"A. That's true."

The State, after questioning the juror on a different issue, continued:

"Q. Again, if the evidence showed you that it was proper that the question should be answered 'yes', could you always answer it 'yes'?

"A. Yes.

"Q. Knowing that the defendant—

"A. It is not impossible that I would answer that one 'yes'; it's not probable.

"Q. Maybe it's semantics and I probably shouldn't hit on it much more and I won't.

"Q. Are you saying that there are some situations where you feel the evidence should be and is 'yes', but you would answer it 'no' because you didn't feel they deserved the death penalty, but that you would do your best to answer the question and that you would answer it 'yes' or 'no' based on the evidence and not the result that's going to occur, the punishment?

"A. No, I would have to look at the result in spite of the law.

"Q. So there may be some situations or would be some situations where—

"A. If by answering 'yes' to the probability that that person might remain violent, I would be agreeing to a death sentence, I guess I would have to say 'no'.

"Q. So you're being very honest. If you were placed in a situation, you might not always be able to follow the law as to when somebody should receive the death penalty?

"A. Right.

"Q. Okay."