

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

---
### NO. AP-76,535
---

**CORTNE MAREESE ROBINSON, Appellant**

**v.**

**THE STATE OF TEXAS**

---
### ON DIRECT APPEAL FROM CAUSE NO. 09-0411X IN THE 71ST DISTRICT COURT HARRISON COUNTY
---

JOHNSON, J., delivered the opinion of the Court in which KELLER, P.J., PRICE, WOMACK, KEASLER, HERVEY, COCHRAN, and ALCALÁ, JJ., joined. MEYERS, J., did not participate.

### O P I N I O N

Appellant was charged with intentionally causing the death of Frank Zabokrtsky during the course of committing or attempting to commit burglary of a habitation or robbery. In March 2011, a jury convicted appellant of capital murder. TEX. PENAL CODE § 19.03(a)(2). Based on the jury's

answers to the special issues set forth in the Texas Code of Criminal Procedure, Article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071, § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071, § 2(h).

After reviewing appellant's six points of error, we find them to be without merit and affirm the trial court's judgment and sentence of death.

**Facts**

Early in the morning of September 20, 2009, Frank and Arnola Zabokrtsky, both eighty-two years old, were asleep in their bedroom when appellant and two accomplices, Travion Young and Bradney Smith, broke into their home. Arnola was awakened by someone, later identified as Young, telling her to sit up, but Frank, who was not wearing his hearing aids, stayed asleep. Arnola saw three people with flashlights and guns. Their mouths and noses were covered by handkerchiefs. Young asked her where the money was. When she said that she did not have any money in the house, he asked her about her ATM card, and she informed him that she did not have one. About that time, Frank awoke and tried to sit up. Appellant and Smith pushed him down onto the bed, but he attempted to sit up again, and a struggle ensued.

While appellant and Smith were fighting with Frank, Young told Arnola to get out of bed and sit in a folding chair at the foot of the bed. She complied, and he tied her to the chair and began to drag her and the chair out of the room. She could not see everything that was happening to Frank, but she heard gun shots and saw Frank fall to the floor.

Young dragged Arnola and the chair down the hall to the bathroom, where he beat and raped her. He then told her to get dressed. After she was dressed, he used duct tape to cover her mouth

---

[1] Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

and to bind her hands and feet. During these events, she could hear noises and voices coming from other parts of the house as appellant and Smith searched for things to steal. Young carried her to the dining area, where appellant and Smith were waiting. She could see items that had been emptied from her purse lying on the floor.

Someone put something over her head, led her into the garage, and pushed her into the trunk of her car. Arnola heard the men enter the passenger compartment of her car, and she felt the car drive out onto the street. While riding in the trunk, Arnola was able to free her hands. Eventually, she felt the car stop and heard all three men get out. When she could not hear them any more, Arnola pulled the interior safety release and climbed out of the trunk. The men had left the keys in the car, and she was able to drive to the police station. She passed the three men as they were walking on the side of the road and reported their location to police officers.

Appellant and his accomplices were arrested a short time later. All three men had gloves in their pockets, and Young and Smith also had bandanas and flashlights. A roll of duct tape and a bottle of Frank's prescription medication were found in Young's pockets. A wallet containing Frank's identification and credit cards was found in Smith's pocket. A silver- or nickel-plated Ruger .357 Magnum revolver was found on the ground under appellant's foot.

Appellant and Young were taken to the police station in the same patrol car. While sitting in the car, they talked about the offense they had just committed. Appellant stated that he "almost shot her there in that room," and he "should have went ahead and killed that bitch." He composed a rap song, saying in part, "Fuck the laws . . . [b]ust them in the jaw with a nickel-plated," and, "I pulled that trigger. Yes, I'm that n-----."

When questioned by police, appellant admitted that he took a gun with him in preparation

for the burglary. He stated that the gun fired while he was pointing it at Frank and Frank grabbed his arm. He stated that he knew that Young had tied up Arnola and taken her into the bathroom, but that he did not know that she had been raped until the police told him. Appellant acknowledged that he walked Arnola from her dining room to the trunk of her car and that he drove her car to the wooded area where he and his accomplices abandoned it.

A firearms examiner testified that the gun that was recovered from appellant could not have been fired accidentally. The medical examiner testified that Frank was shot in the abdomen. He also testified that, based on the size and shape of the wounds on Frank's face and head, he had been hit in the face and head with the gun. The jury also learned that appellant made a telephone call from the jail in which he admitted to his mother that he committed the offenses he was being charged with, except for sexual assault.[2]

Appellant's defense at the guilt phase was that he was guilty of felony murder rather than capital murder. Defense counsel conceded that the shooting was not accidental but, based on the evidence that Frank grabbed appellant's arm, he argued that the state had not proven beyond a reasonable doubt that appellant committed an intentional killing. He argued that the jury could find that appellant was aware that his conduct was reasonably certain to cause the result, but not that appellant had the specific intent to kill.[3]

---

[2] At the time of the phone call, appellant was facing charges for burglary and aggravated assault, *inter alia,* but the aggravated assault charge was changed to capital murder when Frank died from his injuries two days after the attack.

[3] *See* TEX. PENAL CODE § 19.03(a)(2) (providing that a person commits capital murder if he intentionally commits murder as defined under § 19.02(b)(1) in the course of committing or attempting to commit burglary or robbery); *Demouchette v. State,* 731 S.W.2d 75, 80 (Tex. Crim. App. 1986) (in § 19.03(a)(2) "intentionally commits the murder" makes "intentional" the culpable mental state necessary for conviction of capital murder and excludes the possibility of a "knowing" capital murder); *see also Mosley v. State,* 983 S.W.2d 249, 254 (Tex. Crim. App. 1998) (jury may infer intent to kill from the use of a deadly weapon unless it would not be reasonable to infer that

**Spectator Outburst**

In his first point of error, appellant alleges that the trial court erred in overruling his motion for mistrial after the victim's son-in-law attempted to attack him in the jury's presence. Specifically, appellant complains that, during the publication to the jury of the audio-visual recording of appellant and Young in the patrol car, the victim's son-in-law "started screaming profanities at Appellant" and ran toward him "in an obvious attempt to assault Appellant." Law-enforcement officers stopped him before he reached appellant, but it took several officers to restrain him and remove him from the courtroom. Appellant asserts that a door was broken and a deputy injured in the struggle.

The recording that was played for the jury showed appellant and Young being arrested and placed in the back seat of the patrol car. While they were sitting handcuffed in the back seat, appellant told Young that they were being recorded. He looked into the camera and stated, "They can probably hear us talking. Want to hear me say something like this? Fuck you." Appellant then told Young that he "should have dumped on that ho ass. Fuck her. Fuck her. I have tomorrow though." He complained that sitting in the police car was uncomfortable and stated that he "still can't believe these mother fuckers got me in the back of their shit." He ridiculed the officers who were outside the car collecting evidence and stated that he "should have got dumped in these fucking fools, man. If I was a n----- man, I should have just, boom, when I could have."

The recording continued while they were transported to the police station. Appellant and Young were again left alone in the car while the transporting officer went inside to make sure that Arnola would not encounter them when they entered the station. While they waited, Young asked

death or serious bodily injury could result from the use of the weapon).

appellant whether "two kids" had a chance at a life sentence.[4] Appellant replied, "No, we ain't even going to count as no kids . . .. Should have went ahead and killed that bitch."

At this point in the proceedings, the victim's son-in-law, who had been standing in the back of the spectators' area of the courtroom, moved quickly toward appellant, yelling, "Fuck you . . .. Fuck you, mother fucker . . .. Should have killed the bitch? Huh?" Meanwhile, the bailiff and deputies stepped forward to restrain him, and the attorneys told them to take the spectator away. He was immediately removed from the courtroom.

After he was gone, both the defense attorney and the prosecutor requested a recess. The jurors were escorted out for a ten-minute recess, and then the judge called them back and announced a lunch recess. He admonished them not to talk to anybody about anything that happened in the courtroom, and he advised them that, when they returned from lunch, he would talk with them and determine whether the incident had any effect upon their ability to serve as fair and impartial jurors. After the jury left, the judge announced that, immediately following the lunch recess, the courtroom would be closed while he conferred with the jury. "Based upon their decisions, then the Court will make decisions on what goes forward or doesn't go forward. But the courtroom will not be available for a period of time while I individually interview the jurors."

During the recess, the judge stated to counsel that he would ask the jurors individually about the effect of the incident on their ability to sit as jurors and whether they would consider it for any purpose. Defense counsel requested that the judge ask the jurors how the incident made them feel about the defendant and the victim. He stated that the court should ask the jurors "whether or not this [outburst] would have any effect on their consideration of the mitigation issues; specifically, the

---

[4] Young was sixteen years old at the time, but appellant was eighteen.

personal, moral blameworthiness of the defendant."

The prosecutor objected that such questioning would amount to a comment on the weight of the evidence by going into potential punishment deliberations. Defense counsel responded, "[T]hese cases end up being all about whether or not the person is going to get the death penalty or life without parole. And this has a direct impact on the possible punishment stage. We should not be . . . restricted . . . to simply the guilt/innocence." Defense counsel asserted that failing to ask the jurors additional questions would deprive appellant of his right to a fair and impartial trial under the Sixth and Fourteenth Amendments to the federal constitution. The court denied defense counsel's request.

When the jurors returned, the judge instructed them to disregard the outburst. He added, "To continue to serve as an impartial juror in this case, this non-evidentiary event must be completely disregarded, and your verdict must be based solely upon evidence developed and admitted at this trial." He then asked each juror, outside the presence of the other jurors, whether he or she could absolutely disregard the incident, not consider it for any purpose, and base his or her decision solely on the evidence admitted by the court. Each juror responded that the incident would not have any bearing on his or her decision.

Defense counsel then moved for a mistrial on the grounds of actual or inherent prejudice. He expressed concern that the incident would affect the jurors' decisions, notwithstanding their assurances that they could disregard it. He noted that part of the courtroom door had been broken in the struggle to remove the spectator. He stated that the event would have a bearing on the jurors' ability to be fair because the spectator had repeated appellant's own words that he "should have shot the bitch." Defense counsel also expressed concern that the incident would impede his ability to

represent appellant effectively because "up until [the outburst], I felt a little more comfortable about a possible li[f]e verdict, and I feel less comfortable about that now because of the display of the family." Counsel added that the jurors were all possible witnesses to a crime committed by the spectator.

Defense counsel also stated that maybe there should have been additional deputies providing security. He noted that, before this incident, the spectator had been sitting in the front row staring at the defense team and defendant and that counsel had asked one of the prosecutors to talk with the spectator and calm him down. The prosecutors explained that, after defense counsel called the matter to their attention, each of them, in separate conversations, asked the spectator to sit toward the back of the courtroom with the rest of the victim's family. One of the prosecutors had a lengthy conversation with him about sitting with the family and playing a supportive role for Arnola. The spectator stated that he did not understand why Arnola could not sit in the front row since she was also a victim, but he did not demonstrate any ill will toward the defense team or indicate that he would do anything violent to the defendant. He moved to the back of the courtroom as requested. At that time, the prosecutors did not perceive that the spectator posed any threat or would disrupt the proceedings.

The judge denied the motion for mistrial, and the spectator was barred from the courthouse. The judge directed the bailiff and chief deputy to guide all of the victim's family members and supporters into the back rows as they entered the courtroom.

When the proceedings resumed, the prosecutor again presented the audiovisual recording of the patrol car conversation from the beginning. After the point at which the spectator disrupted the playing of the recording, appellant continued his comments. "That bitch got out of the trunk. I

almost shot her in that room though, but I didn't. Why, I don't know. . .. I seen homey isn't laying down. I don't know why I didn't shoot that law." He and Young talked about the police officers that they could see in the parking lot outside the car. Appellant joked that an officer they recognized might let them go, and he imagined himself running away while shooting at police officers. He composed a rap song that included the lines, "[P]op the c-o-p. Fuck the laws. . . . Bust them in the jaw with a nickel-plated." Appellant also threatened to beat up any officer who "disrespected" him.

When Young overheard some officers outside the car talking about them, he asked appellant what he thought about the sentencing range: "How long? Like, 25 to life?" Appellant agreed that they were looking at serving "25 to it" and then started composing a rap song again, looking into the camera and saying, "25 to it, but I'm hoping for a 15. . . . Man, I'm a bastard. I pulled that trigger. Yes, I'm that n-----. . . . I know y'all gonna go back and watch this ho too. Fuck y'all."

Appellant concedes that there is no showing of actual prejudice from the spectator's outburst because the jurors did not articulate a consciousness of prejudicial effect. He argues, however, that the outburst is inherently prejudicial because the interaction between the spectator and appellant was much more pronounced and severe than bystander outbursts in other cases in which we have declined to find inherent prejudice. Appellant points out that, as the spectator attempted to assault appellant, he uttered the same words that appellant had just stated in the recording. In addition, appellant argues that the outburst is "inherently more prejudicial" because it occurred early in the guilt phase of the trial rather than during the punishment phase. Appellant asserts that the instruction to disregard was insufficient to cure the harm and that the trial court erred by denying his motion for mistrial.

A trial court's denial of a request for a mistrial is reviewed under an abuse of discretion

standard. *Ladd v. State,* 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). An appellate court views the evidence in the light most favorable to the trial court's ruling, considering only those arguments that were before the court at the time of the ruling. *Ocon v. State,* 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). The ruling must be upheld if it was within the zone of reasonable disagreement. *Id.* A mistrial is an extreme remedy that should be granted "only when residual prejudice remains" after less drastic alternatives have been explored. *Id.* at 884-85.

Spectator conduct that impedes normal trial proceedings will not result in reversible error unless the appellant shows a reasonable probability that the conduct interfered with the jury's verdict. *See Howard v. State,* 941 S.W.2d 102, 117 (Tex. Crim. App. 1996) (reh'g granted, reversed on other grounds). In the context of such outbursts, the trial judge's instructions to disregard are generally considered sufficient to cure the impropriety because it is presumed that the jury will follow the instructions. *Coble v. State,* 330 S.W.3d 253, 292 (Tex. Crim. App. 2010). Injury to a defendant is measured on a case-by-case basis. *Landry v. State,* 706 S.W.2d 105, 112 (Tex. Crim. App. 1985).

In measuring the potential for injury to the defendant, we have considered whether the person who made the outburst was a witness or a bystander. *See, e.g., Stahl v. State,* 749 S.W.2d 826, 829 & n.2 (Tex. Crim. App. 1988). *See also Sparks v. State,* No. AP-76,099, 2010 WL 4132769 at *20 (Tex. Crim. App. Oct. 20, 2010) (not designated for publication). We have also considered whether the outburst was verbal or non-verbal. *See Landry,* 706 S.W.2d at 111-12; *Sparks,* 2010 WL 4132769 at *20. When the outburst was verbal, we have considered whether it contradicted the evidence or an applicable legal defense or affected the credibility of testimony. *See, e.g., Ashley v. State,* 362 S.W.2d 847, 851 (Tex. Crim. App. 1962); *Guse v. State,* 97 Tex. Crim. 212, 214-15, 260 S.W. 852, 854 (Tex. Crim. App. 1923). We have also considered the timing of the outburst and

whether its content would have been relevant and admissible if presented in proper form. *See, e.g., Coble,* 330 S.W.3d at 293.[5] We have weighed the inflammatory effect of the outburst against the strength of the evidence. *See, e.g., Stahl,* 749 S.W.2d at 832 (increased likelihood of prejudice from witness's inflammatory outburst when appellant was convicted of the offense in the face of a reasonably plausible and hotly contested self-defense claim).

Another consideration in assessing the risk of prejudice is the trial court's response, including whether the person who made the outburst was reprimanded or removed from the courtroom, whether the jury was promptly escorted away from the scene of the outburst, and whether the jury received adequate instructions to disregard. *See, e.g., Landry,* 706 S.W.2d at 111-12; *Ashley,* 362 S.W.2d at 850; *Guse,* 260 S.W. at 854. *See also Gamboa v. State,* 296 S.W.3d 574, 580 (Tex. Crim. App. 2009).

In this case, the person who made the outburst was a bystander rather than a witness, and there is no indication in the record that he was identified to the jury. Although his outburst was verbal, he merely repeated appellant's own recorded statements. His outburst did not contradict appellant's defense that he did not intentionally kill Frank, and it did not add any information about appellant that was not already before the jury. The spectator's emotional expression of the family's grief and anger during the guilt phase was arguably inflammatory, but appellant has not demonstrated

---

[5] Contrary to appellant's argument, we have not held categorically that outbursts during the guilt phase are "inherently more prejudicial" than outbursts during the punishment phase. Rather, we have recognized that the timing of an outburst is a factor to be considered in assessing its potential for prejudice. In *Coble,* we observed that a witness's improper emotional outburst during her testimony at the punishment phase, in which she described appellant as "mean," and another witness's outbursts describing appellant as an "evil piece of shit," and stating that she would like to "just knock the shit out of him," constituted character evidence. *See Coble,* 330 S.W.3d at 293. Because character evidence is generally admissible at punishment, the potential for prejudice was less than it would have been if these outbursts had occurred during the guilt phase. *Id.* In sum, we considered the timing of the outbursts as a factor in assessing their potential for prejudice, but we did not state categorically that outbursts during the guilt phase are inherently prejudicial.

how, when weighed against the strength of the evidence, the outburst reasonably could have interfered with the jury's verdict. On the facts of this case, the trial court did not abuse its discretion by denying the motion for mistrial, and the spectator's outburst was not so inflammatory that its potential for prejudice could not be cured by an instruction to disregard.

In addition, the record reflects that the trial court's response to the outburst was adequate to cure any potential for prejudice. The bailiff and deputies quickly detained the spectator and removed him from the courtroom, and he was not allowed to return. At the request of both parties, the judge called a recess, and the jury was escorted out. After the jurors returned, the judge instructed them that they were required to disregard the "non-evidentiary event" and that they were to consider only the evidence admitted by the court in arriving at a verdict. The jurors were questioned individually about their ability to set the outburst aside, and they all affirmed that they would be able to set it aside and consider only the evidence admitted by the trial court in reaching a decision.

After the outburst, the spectator was barred from the courthouse, and all of the victim's family members and supporters were directed to sit in the back rows of the spectators' area. Appellant does not assert, and the record does not reflect, that the prosecutor referred to the outburst before the jury or otherwise exacerbated its potential for prejudice.[6] In fact, the record reflects that the only subsequent reference to the outburst was defense counsel's closing argument during the punishment phase stating that appellant's subdued reaction to the outburst demonstrated that he was not a future danger.

---

[6] In a footnote, appellant asserts that the parties either were or should have been aware that this spectator could "act out" during the trial. Elsewhere, he asserts that the outburst "perhaps could or should have been anticipated by the State." If appellant intends by these assertions to claim ineffective assistance of counsel and/or prosecutorial misconduct in failing to prevent the outburst, his claims are inadequately briefed. *See* TEX. R. APP. PROC. 38.1(i). Additionally, they are not supported by the record.

Appellant has not shown a reasonable probability that the spectator's outburst interfered with the jury's verdict or posed a reasonable probability of injury to himself. Therefore, the outburst did not result in reversible error, and the trial court's denial of the motion for mistrial did not constitute an abuse of discretion. Point of error one is overruled.

## Constitutionality of Article 37.071

Appellant briefs his second, third, fourth, and fifth points of error together. In his second point of error, appellant alleges that the trial court erred in denying his first motion to quash the indictment on the basis of the unconstitutionality of Article 37.071. We understand appellant to allege in his third point of error that the trial court erred in denying his motion to preclude the death penalty because the sentencing statute allows the jury to decide future dangerousness based on the facts of the case.[7] In his fourth point of error, appellant alleges that the trial court erred in denying his motion for the court to declare Article 37.071, Section 2(a), unconstitutional. We understand appellant to allege in his fifth point of error that the trial court erred in denying his motion to preclude the death-penalty option on the ground that the sentencing procedures are unconstitutional because they fail to meet the minimum requirements set forth in *Furman v. Georgia,* 408 U.S. 238 (1972).[8]

Appellant asserts, and the record confirms, that these motions were filed on January 12, 2010, and denied at a pretrial hearing on October 26, 2010. Appellant purports to incorporate the

---

[7] Appellant's third point of error, verbatim, is, "The trial court erred in denying the defense motion to preclude the death penalty [sic] a capital sentence state [sic] unconstitutional because it allows juries to decide future dangerousness based on the facts of the case."

[8] Appellant's fifth point of error, verbatim, is, "The trial court erred in denying defense motion to dismiss the death penalty in the state of Texas on the ground that is [sic] capital sentencing procedures [sic] unconstitutional due to its failure to meet the minimum requirements set forth in *Furman v. Georgia*."

arguments made in the motions, and he adds that Article 37.071 is unconstitutional because the assessment of the death penalty is not truly subject to judicial review on appeal. His brief focuses on the "10-12 rule" and the lack of judicial review of the jury's answers to the special issues.

Appellant acknowledges that we have repeatedly rejected similar contentions in prior cases and explains that he is presenting them on appeal in order to preserve them for federal review. *See, e.g., Mays v. State,* 318 S.W.3d 368, 396 (Tex. Crim. App. 2010); *Threadgill v. State,* 146 S.W.3d 654, 671-72 (Tex. Crim. App. 2004); *Escamilla v. State,* 143 S.W.3d 814, 828-29 (Tex. Crim. App. 2004). We are not persuaded to revisit our prior decisions. Points of error two through five are overruled.

### Eligibility for the Death Penalty

After the presentation of evidence, but prior to final argument at the punishment phase, appellant filed a motion to preclude the death penalty as a sentencing option. In his sixth point of error, appellant alleges that the trial court erred in denying that motion. Appellant purports to incorporate the legal authorities cited in that motion, and he argues that it is unconstitutional to execute him because he was 18 years, 9 months old when the offense was committed. Appellant recognizes that we have rejected this argument in the past, and he explains that he is presenting it on appeal in order to preserve it for federal review.

The State asserts that appellant failed to preserve error because he did not file the motion until after the court's jury charge at punishment had been approved by the court without objection. *See Posey v. State,* 966 S.W.2d 57, 61-62 (Tex. Crim. App. 1998). The State argues, alternatively, that there is no error. *See Roper v. Simmons,* 543 U.S. 551, 567 (2005). Even assuming, without deciding, that appellant preserved error, we agree that the trial court did not err. *See Roper,* 543 U.S.

at 567.  Point of error six is overruled.

We affirm the judgment of the trial court.

Delivered:  June 5, 2013
Do Not Publish