

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-20-00102-CR
_____

DAVEON DEMONTA WOODS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 202nd District Court
Bowie County, Texas
Trial Court No. 19F1714-202

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

During the second of two robbery attempts one evening in late 2019 at a Texarkana apartment complex, in a tragic mistake, the would-be robbers broke into the wrong apartment, one occupied by Craig Garner and family, and fatally shot Garner. The perpetrators in this second robbery attempt included Daveon Demonta Woods. As a result, Woods was convicted of capital murder.[1] Woods's appeal argues three points. We will affirm the trial court's judgment, because (1) there was no abuse of discretion in denying Woods's request for a mistrial, (2) there was no abuse of discretion in admitting the challenged photographs or video recording, and (3) Woods has preserved no complaint about the lack of a jury-panel shuffle.

The asserted points of error do not require a detailed recitation of the facts. The evidence generally set out two attempted robberies on the same November evening at the Texarkana apartment complex occupied by victim Garner and his family. The first, in a parking lot, was completely unrelated to Garner or his family, appears to have been perpetrated by Woods's two associates without involvement by Woods, and was a failure. The second involved Woods with the first two perpetrators and resulted in Garner's death.

## (1) The Trial Court Did Not Abuse Its Discretion in Denying Woods's Request for a Mistrial

During Woods's trial, as the medical examiner testified, someone in the gallery became very upset and acted out, wailing and sobbing for some ninety-nine seconds.[2] When the outburst

---

[1]*See* TEX. PENAL CODE ANN. § 19.03(a)(2) (Supp.). He was sentenced to life imprisonment without the possibility of parole.

[2]Another outburst had occurred during the previous witness, A'Kayla Garner. The State was showing A'Kayla photographs of Garner with A'Kayla and their children. The record simply shows defense counsel stating, "I object to any outbursts from the gallery and would ask the Court to please admonish. That's prejudicial." The trial court

2

occurred in the courtroom, the trial court excused the jury. For the first thirty-nine seconds, the screaming was loud, during which time the jury was removed, Woods objected, and it was determined that an audio recording was being made. After the initial thirty-nine seconds, while the screams continued for a time thereafter, the sound became muffled, indicating that the screamer had likely been removed from the courtroom.

After a recess, Woods made the following account of events:[3]

Mr. Woods was taken to the restroom, and I remained here in the courtroom, but I could hear out in the hallway, I'll just call it yelling, which is the hallway basically directly behind me, which happens to be the same hallway where the jurors are located in the commissioner's courtroom, and I heard it loudly, and I can only speculate that the jurors heard it as well. I had to ask Mr. Woods what the person had said to him, and he said that the lady yelled, you murdered my cousin. I could just tell there was some kind of loud yelling that I don't have any problem at all telling the Court that I don't know how the jury members could not have heard it. That was at 10:51 a.m. The first outburst that caused us to recess was about 10:40. So let me see if there's anything else in my notes. So at least based on those two grounds, obviously the Court was present for the first what I'll call outburst, but not for the second one, but for both of those reasons, we would ask the Court to dismiss this jury and declare a mistrial because of the due process violations for Mr. Woods and his ability to get a fair trial from this particular jury.

The State did not challenge Woods's description of events.

The trial court instructed the jury as follows:

Ladies and gentlemen, at this time I'm going to admonish you to disregard the outburst that we had in the courtroom a few moments ago before we took our break. I'm going to give you the following instruction: To continue to serve as an impartial juror in this case, this non-evidentiary event must be completely

---

admonished the gallery that they were in a "public trial" and that the court had "to maintain absolute decorum and no interruptions." The court continued, "If we have interruptions or if you cannot remain quiet in the courtroom, I'm going to have to ask you to leave." Woods sought no further relief at that time.

[3]These events overlap with the audio recording described above.

disregarded, and your verdict must be based solely on the evidence developed and admitted during this trial. That is what your decision is to be made on.[4]

In a situation such as this, we are to presume that the jurors followed the instructions to disregard. *Coble v. State*, 330 S.W.3d 253, 293 (Tex. Crim. App. 2010).[5]

We review a trial court's denial of a mistrial under an abuse-of-discretion standard. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009); *Sanders v. State*, 387 S.W.3d 680, 687 (Tex. App.—Texarkana 2012, pet. ref'd, untimely filed). We consider "the evidence in the light most favorable to the trial court's ruling, considering only those arguments before the court at the time of the ruling." *Ocon*, 284 S.W.3d at 884 (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)). If the ruling was within the zone of reasonable disagreement, it must be upheld. *Id.*; *Sanders*, 387 S.W.3d at 687. Mistrial is an appropriate remedy only when the error is highly prejudicial and incurable. *Ocon*, 284 S.W.3d at 884 (citing *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004)).

The "probability of injury to the appellant is essential to vitiate the jury's verdict because of the conduct of bystanders." *Ashley v. State*, 362 S.W.2d 847, 850 (Tex. Crim App. 1963) (citing *Guse v. State*, 260 S.W.2d 852, 854 (Tex. Crim App. 1924)). "Conduct from bystanders which interferes with the normal proceedings of a trial will not result in reversible error unless the defendant shows a reasonable probability that the conduct interfered with the jury's verdict."

---

[4]Woods objected to this instruction but does not argue the point on appeal.

[5]In his brief, Woods complains that the trial court "never considered or made any inquiry of the jury if they had heard the outburst while in the jury room or if the outbursts had any effect on their ability to remain as fair and impartial jurors." Woods described the disturbances outside the courtroom but did not explicitly ask the court to take those events into consideration or seek to question any jury members whether they heard the hallway outbursts or if such would have any impact on their deliberations. To the extent his brief relies on those events in his point of error, they were not preserved for our review. *See* TEX. R. APP. P. 33.1.

4

*Landry v. State*, 706 S.W.2d 105, 112 (Tex. Crim. App. 1985). While the jury undoubtedly heard at least some of the outburst, there has been no showing of the effect the outburst had on its verdict, if any.

We find Woods has failed to demonstrate a "reasonable probability" that the outbursts in his trial "interfered with the jury's verdict." *Howard v. State*, 941 S.W.2d 102, 117 (Tex. Crim. App. 1996), *overruled on other grounds by Easley v. State*, 424 S.W.3d 535, 538 n.23 (Tex. Crim. App. 2014). We overrule this point of error.

*(2)     There Was No Abuse of Discretion in Admitting the Challenged Photographs or the Recording*

Woods complains about the admission of a set of photographic exhibits and one recorded exhibit. According to Woods, admission of those exhibits was error, because their probative value was substantially outweighed by a danger of unfair prejudice. *See* TEX. R. EVID. 403. Woods first challenges a set of three photographs of the victim with his family before his demise. Next, Woods complains of a one-minute, sixteen-second segment of the officer's body-cam recording showing the scene as officers discovered it, that is, Garner lying on the floor, bleeding.[6]

First, we address the challenged photographs. The State offered three photographs of Garner in its examination of his widow, A'Kayla. The first was a photograph of Garner and A'Kayla, both smiling, standing next to a sports-utility vehicle on Easter, the day they were engaged. The second showed Garner holding the couple's two children, and the third showed

---

[6]Woods should have presented those as separate points of error, but in the interest of justice, we address them both. "The practice of combining two or more separate issues into a single point of error is strongly discouraged, as it often results in the combined point of error being overruled as multifarious." *Harris v. State*, 133 S.W.3d 760, 764 n.3 (Tex. App.—Texarkana 2004, pet. ref'd).

5

Garner and A'Kayla on their wedding day. Woods objected to admission of the photographs, claiming that "the prejudicial effect vastly outweigh[ed] the probative value," and invoking Rule 403 of the Texas Rules of Evidence. *See* TEX. R. EVID. 403. The State answered that the photographs were offered for A'Kayla to identify the victim.

The indictment alleged that Woods killed Garner. Thus, the State had to prove Garner's identity as the victim of Woods's conduct. Offering photographs of Garner, identified by his wife, is a reasonable method of proving that element of the State's case. *See Gonzalez v. State*, 296 S.W.3d 620, 632 (Tex. App.—El Paso 2009, pet. ref'd) (photograph of murder victim was probative of victim's identity, part of State's burden of proof).

A trial court's decision to admit or exclude evidence is reviewed only for abuse of discretion. *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007). A trial court does not abuse its discretion if the decision to exclude evidence is within the "zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g); *Marsh v. State*, 343 S.W.3d 475, 478 (Tex. App.—Texarkana 2011, pet. ref'd). "We may not substitute our own decision for that of the trial court." *Allen v. State*, 436 S.W.3d 815, 826 (Tex. App.—Texarkana 2014, pet. ref'd) (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)).

> Regarding the photographs of Garner with his family, in his briefing, Woods
>
> concedes that State's exhibit 1, by itself, would most likely not rise to the level of a Rule 403 objection, but coupled with the State's 2 and 3, cumulation of the photos was clearly designed to impress on the jury that the deceased was the loving father of two young children and a loving husband.

Thus, we consider Woods's appellate complaint as addressing State's exhibits two (Garner holding his two children) and three (Garner with A'Kayla at their wedding). Woods alleges that those photographs were cumulative and that they were not admissible as "[t]here had never been an attack on the deceased's character, and being a father or husband were not relevant to any issue in the case."

We find no abuse of discretion in the admission of the photographs. We review a Rule 403 challenge under the analysis described in *Giglioblanco v. State*, 210 S.W.3d 637 (Tex. Crim. App. 2006):

> [We] must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. Of course, these factors may well blend together in practice.

*Id.* at 641–42.

Regarding photographs of Garner, the State needed to identify Garner as the victim alleged in the indictment; having his wife identify him through photographs was a simple and effective way to satisfy that burden. The first two *Giglioblanco* criteria weigh in favor of admission of the photographs.

We find no likelihood, and Woods does not argue any likelihood, that the photographs would have motivated a jury's decision on an improper basis and no likelihood of confusing or distracting the jury from its fact-finding mission. We also see no likelihood that the jury would

7

give the photographs undue weight or that it was not equipped to evaluate their probative value, i.e., identification of Woods's murder victim. As for the amount of time needed to present this evidence, the State spent two pages of the reporter's record, at the end of A'Kayla's testimony, to show A'Kayla the photographs and have her authenticate and identify them. The State's direct examination of A'Kayla took about fourteen pages of testimony. Considering those factors against the first two, we do not see any abuse of discretion by the trial court in admitting the photographs of Garner.

We employ the same *Giglioblanco* analysis to Woods's challenge to the officer's body-cam recording.[7] Office Cole Bredenberg was one of the first officers on the scene of Garner's shooting. The State introduced a brief segment of Bredenberg's body-cam recording. This recording shows Bredenberg and another officer enter the Garner apartment. The officers went room-to-room, securing the scene; A'Kayla could be heard sobbing in the background. At about forty-six seconds into the recording, Garner is shown lying prone on the floor, a significant amount of blood below his face. Officers attempt to rouse Garner, then turned him over. The other officer escorted A'Kayla from the room and Bredenberg spoke to Garner. Just before the recording ends, Garner seemed to slightly lift his chin.

This footage had inherent probative value, as it was needed by the State to prove that Garner had been shot in his apartment. The first two *Giglioblanco* criteria weigh in favor of admitting this recording.

---

[7]While Woods offers no substantive briefing on this issue, in light of his capital sentence and in the interest of justice, we explain why Woods's challenge is not well taken.

The recording graphically shows Garner bleeding from his head, on the floor. This suggests a slight tendency for the jury to find guilt on an improper basis, i.e., based on an emotional response from the fact-finder to the distressing image. However, the footage could just as well suggest a proper factual decision, that is, accountability for whoever shot Garner. We do not see how the evidence, though, could have distracted the jury from the main issue before them, deciding Woods's guilt or innocence.

We also find no significant chance that the evidence would have been given undue weight by a jury not equipped to evaluate the evidence's probative force. In voir dire, the venire had been admonished that the jury would see "some pictures [it] probably [did not] want to look at." In opening argument, the State told the jury that the evidence would show that Garner was shot in his apartment after Woods and accomplices broke into that space. A'Kayla had already described for the jury how she found her husband after hearing shots and a commotion. The medical examiner had already told the jury that Garner died from a gunshot wound to his head.

Finally, an inordinate amount of time was not spent presenting the body-cam exhibit. After the brief recording was played for the jury, the State questioned Bredenberg for about two pages of the reporter's record about events depicted in the recording.

"The [footage] [is] gruesome. That is to say, [it is] disagreeable to look at, but [it] depict[s] nothing more than the reality of the brutal crime committed." *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995). The recording showed the immediate aftermath and

consequences of Woods's acts. Weighing the *Giglioblanco* factors, we find no abuse of discretion in the trial court's admitting the body-cam recording.[8]

We overrule this point of error.

*(3)     Woods Has Preserved no Complaint about the Lack of a Jury-Panel Shuffle*

After the parties conducted voir dire and were about to make their peremptory strikes, Garner's attorney told the trial court, "Your Honor, I did discuss with Mr. Woods about the possibility of doing a shuffle. We will not be requesting a shuffle."[9] Nonetheless, on appeal, Woods complains that the trial court erred by not sua sponte shuffling the venire. *See* TEX. CODE CRIM. PROC. ANN. art. 35.11. Acknowledging this problem, Woods blames the trial court. According to Woods, the "trial court could have complied with the [Texas] Constitution and [Article 35.11 and 35.15 of the Texas Code of Criminal Procedure] in various ways but chose not to do so." By conducting voir dire in a "larger forum, such as a local school gymnasium, a church or other private facility" the trial court could have "ensure[d] that [Woods's] right to a fair and impartial jury guaranteed to him under the law[] was not violated[;] however, the trial court chose not to."

---

[8]Woods's brief claims that the body-cam recording also shows "the screaming widow and the crying children being taken out of the room with the officers trying to shield their eyes from the image of their father dying on the floor." We have reviewed the seventy-six second excerpt of the officer's body-cam recording. A'Kayla can be heard sobbing and telling officers her husband's name as they attempt to revive him. For brief seconds, the bodycam pans to the corner of the room where A'Kayla is pacing and sobbing. We cannot see any children in the recording introduced to evidence. The children are visible only in the complete body-cam recording, admitted for record purposes only.

[9]Woods's trial occurred in August 2020, during the height of the coronavirus pandemic. The trial court conducted voir dire in two separate sessions. Woods's attorney made this statement after the second venire panel had been voir dired. So, notwithstanding his waiver, shuffling the venire was not even discussed until after voir dire. It appears that, at that moment, the trial court contemplated another panel being called for voir dire the next day, but that plan was abandoned as unnecessary. Counsel could have been referring to the potential next round of voir dire.

10

Woods presents no argument or authority for this proposition. We can conceive of no reason the trial court would have had to preserve Woods's appellate point for him or to sua sponte shuffle the panel after an express waiver by Woods. Woods has forfeited his complaint. *See* TEX. R. APP. P. 38.1(i) (requiring a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record). We overrule this point of error.

We affirm the trial court's judgment and sentence.


Josh R. Morriss, III
Chief Justice

Date Submitted:     February 17, 2021
Date Decided:       March 17, 2021

Do Not Publish